Robinson, J.
 

 On the night of March 13, 1927, Jasper Russell, while night watchman at the plant of the Midland Steel Company of the city of Cleveland, was shot and killed. The office of that com
 
 *99
 
 pany, on the premises c>f the steel plant, on the same night had been broken and entered and an attempt had been made to open the safe. March 13th was a Sunday. Joseph Weaver had been for several years an employee of the Midland Steel Company, earning as high as $15 per day. On March 5th he severed his connection with that company because of a reduction in wages, and on that day, or thereafter, had complained that his pay envelope had not contained the full amount due him, whereupon the timekeeper informed him that, if he would write him a letter, setting forth his claim, he would check it, and, if a mistake had been made, he would rectify it. On the 10th the timekeeper received a letter from Weaver, setting forth his claim, and on the same day he wrote a letter to Weaver, in which he stated that he had found a mistake in Weaver’s favor to the amount of $6.72, that he had placed that sum in an envelope for him, and directed him to call for it. Weaver received this letter on the 11th.
 

 Alex Maynor was also an employee of the Midland Steel Company and had not severed that relationship with it. On the morning of March 14th a small piece of cloth was discovered upon the high wire fence that inclosed the Midland Steel Company plant. Maynor did not return to work on Monday morning. On Monday evening he was arrested. The piece of cloth found upon the fence was fitted into a hole in his coat, was found to be of the same material, and he was charged with the crime; whereupon he admitted his participation in the crime and implicated Weaver. The two were jointly indicted for murder in the first degree, and the prosecuting attorney elected to try Weaver first. The trial was
 
 *100
 
 had on the succeeding April 11th, and from day to day. There was no evidence at the trial to connect Weaver with the crime except the evidence of Alex Maynor. There was evidence by two street car conductors that tended to corroborate the evidence of Maynor, to the extent of placing .Weaver in that part of the city where and at the time the crime was committed, and to that extent discredited the testimony of Weaver.
 

 The evidence of Maynor was to the effect that at about the noon hour on March 13th Joseph Weaver came to his room, and, in the course of his testimony, Maynor stated:
 

 “A. Well, he commenced talking about the company had done short-changed him of $6.00. I didn’t know nothing about that. * * * And he told me if I come and go with him he knowed where he could get, get some money. Well, I set and * * * I set and studies a while. * * * ‘Sure,’ and he says, ‘I will call back by here tonight if you say you come, come and go,’ and so I finally answered him ‘yes.’
 

 “Q. Did he say anything else at that time about where you would go? A. Well, he said he would go out there, go out there at this plant.
 

 “Q. And what else did he say about the plant, if anything? A. Well, he goes ahead then; we goes out there.”
 

 Maynor was directed to confine his narrative for the time being to what took place at his room.
 

 “A. Well, just only he said he knowed where this safe was.
 

 “Q.
 
 Was there any more said then? A. And then he said if I come, if I come and go, he had a revolver for refection. * * *
 

 
 *101
 
 “Q. Did Joe Weaver say anything else at that time that you remember at this time? A. No, only he got his coat and hat and left.
 

 “Q. And did you say anything else? A. No.” Maynor further testified that Weaver did call for him that night between 9 and 10 o ’clock, and that he and Weaver rode out to the vicinity of the premises, on the street car, each paying his own fare and sitting apart. It is in respect to this ride out and the ride back, hereinafter referred to, that the conductors, one for each way, corroborate Maynor. May-nor further testified that they left the street car in the vicinity of the plant, walked to the plant, climbed the high wire fence, and that he secured a ladder-from the premises; that Weaver from some place upon the premises secured a hammer and other tools, and that Weaver used the ladder to climb up to the window of the office, broke the window with the hammer, unfastened the latch, raised the window, and climbed in. Of his further participation Maynor says, “I, I clum up there and set down on the window sill and that, that’s fur as I went.” May-nor further testified that while he sat on the window sill Weaver undertook to open the safe; that, after Weaver had worked on the safe for about one-hálf hour, Weaver said he heard the night watchman approaching; that thereupon he (Maynor) jumped down from the window, and Weaver jumped out of the window just behind him. .
 

 “Q. Well now, when you got down to run, did you say anything to Joe or did Joe say anything to you? A. Well, he says he will go up there and stash himself there at this water house. * * *
 

 “Q. Did he say anything further about where you
 
 *102
 
 were to go or not? A. Well, lie says, lie says, ‘You go, you go on down behind that, behind that there ear shop.’ ”
 

 Maynor testified that he ran down behind the car shop, and that Weaver ran behind the water house; that, as the night watchman approached, Weaver shot him; that the night watchman fell.
 

 “Q. Could you tell whether he was lying face down or not? A. Well, well I couldn’t tell exactly whether his face was down, but it seemed like to me, yes, he was laying on his face.
 

 “Q. What did you see Weaver do then after the watchman was found? A. Then, then after, after he made the second shot, why he steps up and commences, commences search him.
 

 “Q. And when you say ‘commenced to search,’ tell us just what you mean so that we won’t misunderstand you. How did he search? A. He commenced going, going into his pockets.
 

 ‘ ‘ Q. And then what did he do ? A. He got out one, one little, one little black pocketbook that I could see from the distance that I was standing off from him.
 

 “Q. How far from Weaver were you? A. I was, 1 was about fifteen, I was a little bettern fifteen foot from him. * * *
 

 “Q. How many poeketbooks did you see him get? A. One.
 

 “Q. That is all you saw? A. That is all, that is all I saw, but after they had done rested me over to the police station why the officer showed two.
 

 “Q. Then you saw two? A. Sure.
 

 “Q. But that night all you saw was one? A. One.
 

 “Q. Did you see what Weaver did with them? A. No, I don’t. * * *
 

 
 *103
 
 “Q. Did Weaver say anything about that pocketbook? A. Well, after he gets the pocketbook he says, ‘Here, here’s two little tickets.’ Well, at that time I breaks into run to leave then.”
 

 Maynor testified that Weaver followed close behind him; that they climbed the fence; that in climbing the fence he (Maynor) caught his coat upon the barbed wire and tore a piece out of it (which was the piece of cloth that led to his identification); that they boarded a street car, each paid his own fare and sat apart, rode back to the city, and separated.
 

 Joseph Weaver testified that he had been at May-nor’s place about noon of the 13th; that he went there to solicit an order of Maynor for cloth for a dress for Mrs. Maynor; that he had been engaged for some time in the sale of suits and goods for the Atlas Tailoring Company, after working hours and on Sundays; that while at Maynor’s he asked May-nor for a revolver that he (Weaver) had purchased when he was keeping house two years before, and which he had delivered to Maynor for safe-keeping a little more than a month before, when he broke up housekeeping; that the revolver was produced, and Maynor said to him that he had a purchaser for the revolver who would pay $25 for it, whereupon Weaver stated to him that he might sell it for the $25, and left the revolver with Maynor; that he gave Maynor a slip of paper upon which he placed his name and street address, so that Maynor might know where to reach him in the event that he should conclude to order the cloth for a dress for his wife, which slip of paper was found upon Maynor when he was arrested. He denied specifically the evidence of Maynor with reference to asking him to go with
 
 *104
 
 him to the Midland Steel plant, denied going to the Midland Steel plant, and all knowledge of or connection with the attempted burglary and the murder, and accounted for his movements and whereabouts during all that day and night.
 

 The evidence disclosed that Jasper Russell was killed with a .32-caliber bullet; that the revolver above mentioned was of that caliber. No revolver was found at the scene of the crime, nor in the possession of or at the rooming place of either "Weaver or Maynor, nor was the revolver, testified of by Weaver as being in the possession of Maynor, and denied by Maynor, ever found. The question, therefore, whether Joseph Weaver had in his possession that night a revolver of that caliber, or a revolver of any kind, had an important bearing upon the probable guilt or innocence of Weaver; for, notwithstanding the fact that the jury found Weaver guilty and did not recommend mercy, the evidence was such that, giving equal credence to Weaver and Maynor, it was difficult to determine wherein even the preponderance lay, for Weaver was fairly corroborated as to his whereabouts during all that day and night by disinterested witnesses, apparently of the station and degree of intelligence and reliability of both Weaver and Maynor; the greater number of witnesses, the plaintiff in error, and Maynor being Georgia negroes. The corroborating evidence of the two street car conductors, while tending to corroborate Maynor with reference to the trip out to the vicinity of the crime and back, was, by reason of certain facts developed at the trial, subject to the suspicion that it emanated from suggestion rather than recollection, however honestly believed by the
 
 *105
 
 witnesses themselves. So that the conclusion of guilt beyond a reasonable doubt could only have been arrived at by the process of wholly disbelieving the testimony of Weaver and believing the testimony of Maynor.
 

 On Tuesday the 15th, following the murder on Sunday the 13th, Weaver was arrested while at work at the Hydraulic Steel Company plant, where he had worked from the time he discontinued work at the Midland Steel Company, including the Monday after the murder; from there taken to his room, which was searched in his presence; and thence taken to the police station, and thereafter detained. On the 16th, Wednesday, following the murder on Sunday, the police, unaccompanied by Weaver, went to his rooming house and took into custody his landlady, one Evelyn Bedell, and also a niece of Evelyn Bedell, who was 5 years old the preceding September. At the trial, Evelyn Bedell was subpoenaed by Weaver to testify as to his presence.in her house during the evening and night of the 13th, and did so testify, and did not testify in chief as to any other matter. Upon cross-examination, she was asked by the state the following questions, referring to the niece:
 

 “How old did you say she was? A. She was five last September.
 

 “Q. Was she there when the officers came? A. Not that morning.
 

 “Q. Was she there some other time when the officers came? A. That Wednesday when they had taken me down, they had taken her down.
 

 “Q. And did the officers say anything to her? A. Yes.
 

 
 *106
 
 “Q. What did she say to them? (Objected to, objection overruled, and exception saved. Question repeated.) A. When they had taken her to the police station they asked her had she seen Joe with a gun, with a revolver.
 

 “Q. What did she say? A. She first said ‘Yes,’ and then she said ‘No.’
 

 “Q. Well now, when she said, ‘Yes,’ what else did she say? A. I don’t know.
 

 “Q. Did you hear what else she said? A. That is what the kid said, ‘I don’t know.’
 

 “Q. After the kid told the officer something about Joe and a gun, what did you say to the kid? A. I said, “Tell the truth.’
 

 “Q. Isn’t this the fact, didn’t the kid say that there was a revolver underneath the bathtub in your bathroom and didn’t you tell her to keep her mouth shut and didn’t she then say that there wasn’t? A. No, I did not.
 

 “Q. That didn’t happen that way? A. No.
 

 “Q. This conversation was in your own home, wasn’t it? A. It was not.
 

 “Q. Where was it? A. It was in the detective— it was in police central station.
 

 “Q. When was the first time that officers came there? A. They came there on a Tuesday morning.
 

 “Q. Was Weaver with them? A. Yes.
 

 “Q: Did you see where the officers went? A. I did.
 

 “Q. Where did they go? A. They went upstairs to Weaver’s bedroom?”
 

 On rebuttal, the state called Joseph Jacobs, a police officer:
 

 “Q. Were you present, Mr. Jacobs, on the 15th
 
 *107
 
 day of March of this year in the morning when Joseph Weaver was brought to his home, being the home of Evelyn Bedell, after his arrest at the Hydraulic — were you there at that time? A. Yes, sir.
 

 ‘ ‘ Q. At the time that you were there did you have occasion to see a young child come into the house? A. We were at the child’s home where Weaver lived.
 

 “Q. Did you see Evelyn Bedell at that time? A. Well, that wasn’t on the 15th.
 

 “Q. When was it? A. That was about on the 16th.
 

 “Q. I see. Did you see Evelyn Bedell at that time? A. The day we walked into the — were going into this house, the child was on the porch with roller skates. * * *
 

 ‘ ‘ Q. Did you see Evelyn Bedell and a child close together at any time? A. Child came to the door
 

 right following us up while we were walking in. * # *
 

 “Q. When you went in what, if anything, did the child say to Mrs. Bedell, and what, if anything, did Mrs. Bedell say to the child? (Objection; overruled and exception.) A. The child says, ‘You want that gun that was found under the tub?’
 

 “Q. The child said that to who? A. She said it to nobody in particular. She says ‘Are you after that?’ and possibly referred to us. I would take it so.
 

 “Q. Who was there? A. The child said,‘Are you after the gun that was found under the tub?’
 

 “Q. And what, if anything, did Evelyn Bedell say? A. ‘Oh, you keep quiet,’ and said to us, ‘She don’t know what she’s talking about.’ ”
 

 
 *108
 
 There is no way of disguising the fact that the purpose of that part of the cross-examination of the witness Bedell, and of the direct examination of the witness Jacobs, was to bring to the attention of the jury the declarations of this 5 year old negro child, made in the absence of Weaver, made three days after the crime was committed, miles away from the scene of the crime; and the fact that it was developed upon cross-examination under the guise of laying a foundation for impeachment, and was afterwards offered as impeachment, in no way justifies it. The right to cross-examine a witness does not extend beyond the subjects inquired of by the party offering the witness and the subjects the party offering the witness was entitled to but did not inquire about. The defendant at the trial did not inquire as to the declarations of the 5 year old child, and was not entitled to inquire as to such declarations. The fact that the state was erroneously permitted to inquire of such declarations furnishes no foundation upon which to base the introduction of further incompetent evidence. Aside from the incompetence of the evidence elicited from the witness Bedell on cross-examination, the ground laid for the impeachment was at the central police station and not at the rooming house of the witness Bedell, and did not entitle the state to introduce evidence of a conversation at the rooming house; and, aside from that, even though the foundation had been laid at the rooming house, the right to impeach extended only to the remark which the witness testified she ma.de or denied that she made.
 

 The inquiry of the witness Bedell was as to a declaration of a child who did not testify, and was too
 
 *109
 
 young to testify, and, being neither a part of the
 
 res gestae,
 
 nor made in the presence of the defendant, was purely hearsay. The impeaching testimony of the witness Jacobs was tinctured with the same vice.
 

 While it is always bad practice and fruitful of much imposition upon the court, the jury, and the adverse party, to allow impeaching evidence by an impeaching witness to be elicited in the form of a narrative of his recollection of events and conversations, it is error to permit it where the purpose to get incompetent evidence before the jury is manifest. In such case it is the duty of the court to require that the witness’ attention be directed to the exact testimony sought to be impeached and his response confined to a denial or an affirmance.
 

 In the instant case, with the testimony of Weaver and Maynor in conflict at every point, with each vitally interested in saving his own life, with some evidence corroborative of each, but not complete or conclusive as to either, the admission of the hearsay evidence of the declarations of this 5 year old child, the only evidence in the record upon that subject, placing the gun that probably killed Jasper Russell in the possession of Weaver instead of Maynor, probably afforded that corroboration to the evidence of Maynor that enabled the jury to transform a grave doubt into a reasonable certainty and controlled its verdict.
 

 That such evidence was not competent as substantive proof of the existence of a revolver at the time and place indicated by the hearsay evidence is so elementary that it need not be argued. This court had occasion, in the case of
 
 Geiger
 
 v.
 
 State,
 
 70
 
 *110
 
 Ohio St., 400, 71 N. E., 721, to consider evidence of a similar character. There a child 4 years old, in response to questions propounded to him by a police officer
 
 in the presence of the
 
 accused, related that he had seen the accused commit the murder, how he committed it, and when. The accused made no comment. Upon the theory that the circumstances required the accused to contradict the child, witnesses were permitted to testify of the questions propounded to the child and of the answers made by the child. The conviction was reversed by.this court upon the sole ground of the error in the admission of such evidence.
 

 The judgment of the Court of Appeals and the judgment of the court of common pleas are reversed, the verdict of the jury is set aside, and the cause is remanded to the court of common pleas for further proceedings according to law.
 

 Judgment reversed and cause remanded.
 

 Kinkade, Jones, Matthias and Allen, JJ., concur.