## THORP v MAATZ

Ohio Appeals, 6th Dist, Sandusky Co

Decided Feb 23, 1937

George Cheney, Fremont, and Culbert & Culbert, Fremont, for appellant.

Stahl, Stahl & Stahl, Fremont, for appellee.

## OPINION

By LLOYD, J.

In the trial of the action brought in the Court of Common Pleas by the appellant administratrix, Lillie Bell Thorpe, as plaintiff against the appellee Howard Maatz as defendant, the jury returned a verdict in favor of the defendant. From the judgment entered on this verdict the appellant appeals to this court on questions of law. The basis of the cause of action of appellant was the wrongful death of Helen Britner Thorp alleged to have been proximately caused by the negligence of appellee.

The decedent, who was eighteen years old at the time of her death, left as next of kin surviving her, her mother, now Mrs. Theander, living at Tiffin, two brothers Paul and Clarence, sixteen and eighteen years of age, and a married sister, twenty-two years of age, residing at Fremont. At about one o'clock A. M., on June 30, 1935, a collision occurred near the intersection of U. S. Route No. 20 and State Route No. 185 between a Chevrolet automobile operated by appellee and a motorcycle upon which the decedent was riding as a guest, owned and operated by William J. Berkley. This collision unquestionably resulted in the death of Helen Britner Thorpe.

The evidence is diametrically in opposition as to whether negligence of the appellee proximately caused the collision. And, there also was evidence to justify a finding that the decedent was guilty of contributory negligence. There was no direct evidence that she possessed any substantial earning capacity or that there was any reasonable probability deducible from her then position in life that she ever would be able to contribute anything to the support of her mother, sister or brothers, or that, had she lived, she would during her lifetime have accumulated any estate. But there was evidence that the decedent was in good health and although she saw them infrequently, was friendly with her relatives; had just graduated from high school the previous June; was energetic, intellectually bright and alert, and industriously minded, and had earned some little money while attending school, and at the time of her death had the "promise of a job at the Kresge Store in Fremont."

Her parents' name was Britner but, although not adopted by them, she had lived with foster parents by the name of Thorp some eight or more years prior to her death and had not contributed anything to the support of the next of kin for whose pecuniary benefit the action was brought, and had not at her death any estate.

Deeming the others as immaterial, we shall refer to but two of the assigned errors, of which only one is of real substance.

At the conclusion of all of the evidence, the trial judge said that:

"As to the argument, I think 40 minutes on a side should be sufficient. We will start on that basis."

Thereupon appellant's attorney, waiving the opening argument, the court said to him:

"Before we proceed; the entire 40 minutes can not be used in the closing argument. So before you waive, I will say that not more than half of the time can be used for the closing."

Counsel for plaintiff replied:

"Note exceptions to the court's ruling in that, and we will waive argument."

After counsel for appellant had consumed the twenty minutes in reply to the forty minute argument of counsel for appellee, the court said to him: "Your time is about up." Counsel asked for "five more minutes." The court allowed him two, saying:

"You waived your opening argument and you can not double up on it now."

Of course, the argument in reply to that made in behalf of the appellee is supposed to be just what it purports to be, an answering argument, which might reasonably have required forty minutes, depending on the nature of the argument of opposing counsel. In the instant case, the arguments of counsel do not appear in the record and we find nothing ██ therein to evidence an abuse of discretion on the part of the trial court. We refer thus at length to this assigned error only because of the undue stress laid thereon by appellant.

The other error relates to testimony offered to impeach that of Berkley, the driver of the motorcycle. On cross-examination by counsel for Maatz, Berkley was asked these questions:

"Q. And when did you see Ralph Harris next? A. In the hospital.

Q. When was that? A The first or second day afterwards. I was sort of delirious and didn't know much. I couldn't just tell.

Q. You remember talking to him? A. When he came in.

Q. You remember of discussing with him how this accident occurred? A. We talked that over while I was talking to him about how it occurred, but I couldn't tell how or when it was.

Q. I will ask you on the day that Helen Thorp died, if Ralph Harris did not visit you at the hospital and in your room at the hospital you told him the accident occurred when you were trying to give Helen Thorp a thrill. * * * Whether you didn't tell Ralph Harris in your hospital room on that day that you were trying to give Helen Thorp a thrill and that . you ran directly toward the approaching automobile and that you didn't turn back on your own side quickly enough to avoid the collision? A. No such statement was made.

Q. I will ask you if you did not tell Ralph Harris in the hospital, while you were still there, that when the collision occurred you were way on the wrong side of the road, but that you managed to keep the motorcycle upright until you got to the edge of the road or words to that effect? A. There was no such statements made."

Harris was called as a witness by counsel for Maatz and in the transcript of his testimony we find, among others, the following questions and answers:

"Q. Did you have any talk with Mr. Berkley at the hospital? A. I did.

Q. When was that? A. The day after Helen died.

Q. And give to the jury what that talk was.

Mr. Cheney: Object.

Court: What is the ground?

Mr. Cheney: The decedent was not even there. She was dead.

Court: You claim they have no right to impeach the witness unless the person is there present? Now if I sustain your objection your record will not be worth two cents. That is overruled.

A. Bill was in a bad mood and he started out to tell me that I was the only one he could trust with the story and how this and that occurred and he led up to the story. As he was going out there he said that—He gave me the words that Helen used about the thrill he would give her.

Q. What words did he use? A. He said 'On the way over to Clyde I was riding as I did with you and I put my arm around Helen and with my right hand on the grip and throttle' and he said he naturally thought he could get away with what he had pulled with me, by heading for another car and then turning, and he said he just made a mistake in his judgment and he didn't get back the way he should have and he was hit on the left side of the road. And he would pass approaching cars and when you think they are about ready to collide he would get back over. And he told me that is just what happened, and he said he would never get over the thought of the headlights in his face. And he cried then. That is the biggest part of the story as I can remember it definitely."

The court then advised the jury that the only purpose of this testimony was to assist its members in determining what weight should be given to the testimony of Berkley.

"Q. Did William Berkley at that time in the hospital tell you that he had been going to give Helen Thorp a good ride and a good thrill? A. He did.

Q. Had you ever seen William Berkley with Helen Thorp riding on the motorcycle previous to that with his one arm on the throttle and the other arm around Helen? A. I did.

Q. On how many occasions? A. Twice before.

Q. Did he tell you at that time and place that he was riding with her in that fashion when this accident occurred?. A. Yes, he did."

It is noticeable that part of the Harris' testimony is responsive to the foundation therefor premised on the cross-examination testimony of Berkley, but a considerable part thereof is not responsive thereto, and the primary question asked being improper and promptly objected to, no motion to strike the testimony from the record was necessary to make it incompetent. Practically all of the Harris testimony being in narrative form, it would seem highly probable that the jury must have been unduly impressed thereby with the belief that the collision was caused as thus outlined. By contrasting the foregoing with the questions therefore asked of and answered by Berkley, it is so obvious that the latter could not serve as a foundation for a large part of the Harris testimony as to make further comment thereon unnecessary.

In the third paragraph of the syllabus in the case of Radke v State, 107 Oh St 399, 140 NE 586, we read:

"Evidence relating to special impeachment tending to contradict some statement made by a witness in a cause on trial is not competent until the foundation is first laid by inquiring of the witness sought to be impeached as to whether or not, at some time and at some place, and to some person or persons, as definitely fixed or named as may be, he did not make some particular contradictory statement, advising the witness, at least in substance, what such statement was."

Without questioning the rightness of the motive and purpose of counsel in asking the questions, their impropriety is obvious and the probable effect upon the jury of the answers to the witness, in the light of the decision of the Supreme Court in Weaver v State, 120 Oh St 97, 165 NE 569, is equally apparent. In that case the court holds that:

"When it is made to appear to the court that the purpose or the effect of offering impeaching testimony is or will be to bring incompetent evidence to the knowledge of the jury, it is the duty of the court to require that such impeaching testimony be confined to a denial or an affirmance of a question or questions for which a foundation has been laid and which do not include incompetent evidence."

The testimony of Harris as to what Berkley told him at the hospital included the elements essential to proof of the contributory negligence of the decedent and the alleged negligence of Maatz. The only element not included therein was that relating to the pecuniary injury, if any, sustained by the next of kin of decedent.

If the decedent had been physically or mentally permanently incapacitated to engage in lucrative employment and had no estate or prospect of any, a different situation might be presented, but the relationship existing between decedent and the next of kin in the instant case assumes some pecuniary loss, and therefore if her death was proximately caused by negligence of Maatz, the appellant administratrix would be entitled at least to nominal damages.

Johnston, Admr. v Cleveland & Toledo Rd. Co., 7 Oh St 336, 340, 70 Am. Dec. 75; Steel, Admr. v Kurtz, 28 Oh St 191, 199; Russell v Sunbury, 37 Oh St 372, 376, 41 Am. Rep. 523; Railway Co. v Murphy, Admr., 50 Oh St 135, 141, 33 NE 403; Jackson Knife & Shear Co. v Hathaway, Admr., 7 C.C. (N.S.) 242, 246, 17 C.D. 745; Minglewood Coal & Ice Co. v Carson, Admr., 31 Oh Ap 237, 166 NE 237; Stoltz, Admr. v Baltimore & Ohio Rd. Co., 7 O.D. (N.P.) 435, 441, 7 N.P. 129; Hall, Admr. v Crain, 2 Dec. Rep. 453, 455, 3 W.L.M. 137.

Whether there should have been a verdict in favor of appellant in any sum depended therefore, upon whether Maatz was negligent and if so whether his negligence was the proximate cause of decedent's death, and since the incompetent testimony of Harris related to those issues, its admission was prejudicial and reversible error.

If the appellee were entitled to a verdict for at least nominal damages, then a judgment thereon would carry the costs accruing in the action for which otherwise the appellant would be liable.

This testimony of Harris not being proper by way of impeachment, and admittedly incompetent for any other purpose, its prejudicial effect at once becomes obvious and in our judgment is so pronounced as

to require a reversal of the judgment and the remanding of the cause to the Court of Common Pleas for a new trial.

Judgment reversed and cause remanded.

CARPENTER and OVERMYER, JJ, concur.