Carl Sims PANKEY, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Thomas Leonard POPE and Leonard Daniel Spears, Appellants,

v.

COMMONWEALTH of Kentucky, Appellee.

Verser Joseph SWAITE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

May 12, 1972.

As Modified on Denial of Rehearing Oct. 6, 1972.

Donald M. Heavrin, Foster V. Jones, Jr., Glenn McDonald, J. Daniel Davis, Stuart Lyon, David Kaplan, Edward Brady, Jr., Kaplan, Lyon & Brady, Don H. Major, J. Bruce Miller, Carroll & Miller, Louisville, for appellants.

John B. Breckinridge, Atty. Gen., James M. Ringo, Asst. Atty. Gen., Frankfort, for appellee.

VANCE, Commissioner.

Carl Sims Pankey, Thomas Leonard Pope, Leonard Daniel Spears and Verser Joseph Swaite, hereinafter referred to as Pankey, Pope, Spears and Swaite, respectively, appeal from judgments sentencing each of them to life imprisonment for armed robbery and sentencing each of them to death for murder. They were indicted jointly, tried together, and their appeals have been consolidated for consideration in this court.

On September 1, 1967, a supermarket in Louisville, Kentucky, was robbed at gunpoint by three men. They took $3,000.00 from the store including approximately twenty rolls of quarters and twenty rolls of nickels. They fled from the scene of the crime in an automobile which was stolen on the morning of the robbery.

William Meyers, a police officer, was sitting in his police cruiser near the store. He was notified immediately of the robbery by the store manager who pointed out the getaway car. Officer Meyers gave chase to the fleeing robbers and followed them directly to a parking lot adjacent to the Nolan Building. Apparently this parking lot was a prearranged transfer point and the robbers met at least one confederate there. The automobile used to escape from the scene of the robbery was abandoned on the Nolan Building parking lot. One of the four men jumped into a white Ford automobile and attempted to escape. While Officer Meyers was firing his pistol at the escaping white Ford, he was shot and killed by one of the remaining bandits, all of whom then escaped in a green Chrysler automobile.

In the haste to escape, the driver of the green Chrysler entered the Watterson Expressway near the scene of the robbery in an extremely reckless manner. This reckless operation of the vehicle was noticed by the driver of another automobile who took the license number of the green Chrysler. In a matter of minutes this alert motorist heard a radio broadcast concerning the robbery and the shooting of the police officer and he immediately notified the police of the reckless manner in which the green Chrysler departed the vicinity of the crime and gave the police the license number.

On the basis of this information a multi-state alert was broadcast advising all persons to be on the lookout for a green Chrysler automobile bearing Illinois license plate number NW 5014. The appellant, Pope, was apprehended in this automobile on the following morning in Vincennes, Indiana. The automobile was registered in his name. A shaving kit containing twenty-four rolls of quarters and sixteen rolls of nickels was found in the trunk of the car.

Shortly thereafter a 1967 white Ford automobile, similar to the one used as a getaway car by one of the bandits, was recovered near Springfield, Illinois. This automobile had a bullet hole in the right-rear door and a crease on the trunk deck. A 38-caliber bullet was removed from the right-rear door which proved to have been fired from Officer Meyers' gun. Fingerprints found on the car were identified as those of Spears.

Pope was identified by employees of Hertz-Rent-A-Car as having rented a 1967 white Ford automobile on August 31, 1967, the day before the robbery and murder. This car bore a Kentucky license plate the last three digits of which were 561. A Kentucky license plate, the last three numbers of which were 561, was recovered and turned in to the police officers at Springfield, Illinois. Testimony was introduced that the license plate was recovered near the place where the white Ford was discovered.

Pope and Spears did not testify in their own behalf. Pankey and Swaite offered the alibi that on the day of the robbery and murder they, along with one Richard Blassick and Hollis Pruitt, were in Belvedere, Illinois, and committed a robbery of the Pacemaker Market in that city. The Pacemaker Market in Belvedere was, in fact, robbed on September 1, 1967.

Pankey and Swaite attempted to bring Richard Blassick to Louisville as a witness for them but he was unable to appear for the reason that he was on trial in another city for the robbery of yet another supermarket (not the Pacemaker Market in Belvedere). Richard Blassick's wife, Sandra, appeared as a witness and to some extent corroborated the alibi of Pankey and Swaite concerning their presence in Belvedere, Illinois. She testified that her husband's business was armed robbery; that he had planned the Pacemaker robbery and that Pankey and Swaite were in Belvedere on September 1, 1967, to participate therein.

Each of the appellants was identified by at least one eyewitness either as a participant in the robbery or as one of the four men who fled from the Nolan Building parking lot. In addition to the eyewitness' testimony, Spears was implicated by fingerprints and Pope by ownership of the green Chrysler and the evidence that he rented the white Ford getaway car.

Numerous grounds of error have been asserted by one or more of the appellants. We shall discuss each of the grounds separately and where necessary discuss further the evidence relating to the alleged error.

## 1—DENIAL OF EXAMINING TRIAL

The appellants alleged prejudicial error in that they were denied a preliminary hearing and thereby were deprived of the right to discover certain evidence. The evidence in this case was submitted directly to a grand jury and no examining trial was

**518**

held. An examining trial is not designed as a discovery procedure for an accused but rather as a protection to prevent his detention in the event that probable cause is not shown. We have frequently held that when an indictment results from direct submission of evidence to a grand jury there is no cause for or right to an examining trial and the failure to conduct an examining trial is not erroneous. Jenkins v. Commonwealth, Ky., 477 S.W.2d 795 (decided March 3, 1972); Commonwealth v. Watkins, Ky., 398 S.W.2d 698 (1966) and Maggard v. Commonwealth, Ky., 394 S.W.2d 893 (1965).

█ The appellants also claimed error in that they were not permitted to appear as witnesses before the grand jury which indicted them. We do not find in the record a request on their part that they be permitted to appear before the grand jury but in any event the denial of such a request would not have been error. It is not the function of the grand jury to determine guilt or innocence but only to determine whether the evidence offered by the state is sufficient to warrant putting the accused to trial. The accused has no constitutional right to appear as a witness before the grand jury or to examine other witnesses who appear. 38 C.J.S. Grand Juries § 39.

## 2—ALLEGED IMPROPER CONDUCT AT LINEUP

█ The appellants Pope and Spears alleged that the testimony of an eyewitness was tainted as a result of an improperly conducted police lineup. They rely upon United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *Wade* dealt with a situation in which an indigent accused, without benefit of counsel and without having waived counsel, was subjected to a police lineup. In this case the accused were represented by counsel who were present when the lineup was conducted and *Wade* is not applicable. The circumstances of the conduct of the lineup about which appellants complain were presented to the jury and the jury had ample opportunity to judge the credibility of the testimony.

## 3—DENIAL OF MOTIONS FOR SEPARATE TRIAL

All of the appellants contend that the court erred in not sustaining their motions for separate trial.

RCr 9.16 provides:

"If it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses or of defendants in an indictment or information or by joinder for trial, the court shall order separate trials of counts, grant separate trials of defendants or provide whatever other relief justice requires. * * *."

█ Whether a motion for separate trial should be granted is a matter which addresses itself to the discretion of the trial court. Hoskins v. Commonwealth, Ky., 374 S.W.2d 839 (1964) and Underwood v. Commonwealth, Ky., 390 S.W.2d 635 (1965).

█ Appellants assert their defenses were antagonistic to each other which fact was prejudicial in a joint trial. Two of the appellants offered defenses. The other two did not. The defenses were not antagonistic or incompatible. All appellants pleaded not guilty and no appellant presented a defense which refuted a defense of any codefendant. Although the quantity of proof against some of the appellants was greater than against others we believe that the jury was able to separate the evidence which was competent as to each defendant and to render a verdict as to each based upon evidence which pertained to him. The fact that one of the appellants was impeached by proof of a past conviction of felony would not as a matter of law require a separation of trials. Alford v. Commonwealth, Ky., 432 S.W.2d 414 (1968).

The trial court did not abuse its discretion in denying appellants' motion for separate trials.

## 4—QUALIFYING JURY AS TO DEATH PENALTY

All appellants objected to the procedure whereby many jurors who indicated they could not impose the death penalty in any case were stricken for cause. The specific objection was that the inability of particular jurors to return a verdict of death under any circumstance was not clearly evidenced by a voluntary expression of the jurors but resulted from a series of leading questions by the Commonwealth's Attorney.

■ A typical examination by the Commonwealth's Attorney was as follows:

"Q * * *. Sir, have you conscientious or other scruples against the imposition of a death sentence?

A Yes sir.

Q So you could not, I take it then, under any circumstances impose a death sentence?

A No."

The juror was then stricken for cause.

In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court overturned a death sentence in a case in which jurors who were opposed to the death penalty were excluded from the jury. *Witherspoon* does not prohibit dismissal for cause however if the opposition to the death penalty is so strong that the juror could not under any circumstances impose the penalty.

In this case many jurors were excluded when, as a result of leading questions by the Commonwealth's Attorney, they indicated they could not impose the death penalty. The appellants were denied the opportunity to question these jurors further.

■ While we do not reverse the case upon this ground, we think it better practice for the Commonwealth to phrase its questions to elicit information from the prospective jurors and not lead them to affirm a conclusion expressed by the attorney for the Commonwealth.

## 5—RCr 6.08

■ All of the appellants allege that the court erred in refusing to require the Commonwealth to endorse upon the indictment the names of witnesses who furnished information upon which the indictment was based. RCr 6.08 provides:

"* * *. The names of all persons upon whose statements the information is based shall be endorsed thereon. * * *."

This provision is applicable only to a criminal proceeding by information as distinguished from a proceeding upon an indictment and has no applicability to the instant case in which the appellants were proceeded against by indictment.

## 6—RCr 7.24

The appellants moved the court that the Commonwealth be required to produce for inspection and copying photographs of Eugene Herron and John Ray; other photographs upon which witnesses who viewed the police lineups indicated by identifying mark any of the subjects of the lineup who participated in the crimes; and to furnish the names of all witnesses who failed to identify any one or more of the appellants as a participant in the crimes together with any statements of such witnesses with regard to the description of the participants and other details of the crimes as observed by them.

Counsel for the appellant Pankey asserted a belief that Eugene Herron and John Ray participated in the robbery and murder rather than Pankey and Swaite. Counsel wanted photographs of Herron and Ray to exhibit to the witnesses to the crimes to see if those witnesses would identify either Herron or Ray or both of them. Herron was subpoenaed and appeared at the trial. Ray is supposedly now deceased.

■ The one witness at the trial who saw Herron in the courtroom unequivocally

stated that he was not a participant in the robbery. There was no showing that the Commonwealth had in its possession a picture of either Herron or Ray. The court's ruling upon the production of the photographs of Herron and Ray was not erroneous.

■ Apparently a lineup was conducted in which various appellants were present. The witnesses viewing the lineup were then furnished a photograph of the entire lineup and asked to make an identifying mark on the back thereof indicating any of the subjects of the lineup which the witnesses could identify as having participated in the crimes. The appellants sought the production of all of these photographs for the apparent purpose of determining whether any person who viewed the lineup was unable to identify any one or more of the appellants as participants in the crimes.

The appellants' request for the names of all persons who had failed or were unable to identify one or more of the appellants was directed toward the same end. That a witness was unable to identify one or more of the appellants was not evidence of his innocence because failure to identify could be the result of lack of opportunity of observation, inability of the witness to recall or many other factors.

■ The Commonwealth expressly denied that it had knowledge of any witness who failed to identify any one of the appellants or who would testify that any of the appellants did not participate in the crimes. There was no showing to the contrary. A different matter would be involved if appellants were able to show that they did not have available the testimony of a witness who would have exonerated them because the prosecution knowingly suppressed the name of the witness.

RCr 7.24(2) provides:

"On motion of a defendant the court may order the attorney for the Commonwealth to permit the defendant to inspect and copy or photograph books, papers, documents or tangible objects, or copies or portions thereof, that are in the possession, custody or control of the Commonwealth, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. This provision does not authorize pretrial discovery or inspection of reports, memoranda, or other documents made by officers and agents of the Commonwealth *in connection with the investigation or prosecution of the case, or of statements made to them by witnesses or prospective witnesses* (other than the defendant.)" (Emphasis supplied)

■ It is obvious that the information requested by appellants is exempt from discovery under the rule since pretrial discovery of reports or documents made by the officers in connection with the investigation of the crime or statements made to them by witnesses is not authorized.

Appellants insist however that the holdings of the Supreme Court of the United States in Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), require a reversal of any conviction in which the prosecution has suppressed information favorable to a defendant. *Brady, Giles* and *Napue* do not support the broad contention of appellants. *Napue* voided a conviction in which the prosecutor knowingly permitted a Commonwealth's witness to give perjured testimony and did not disclose that fact. *Brady* and *Giles* involved the suppression of specific items of evidence by a prosecutor the disclosure of which had been requested by the defendant and which would have been useful as evidence for the defendant.

The appellants' request for the production of documents and statements smacked more of the nature of a fishing expedition than of a request to inspect specific items of evi-

dentiary value. While requesting permission to inspect statements of alleged witnesses whose names were unknown, the appellants have not shown that any such witnesses in fact existed and the Commonwealth has denied having knowledge of any such witnesses.

Recent decisions of the Supreme Court have greatly enlarged the extent of discovery permitted to accused persons but no case has been cited which gives free rein to rummage at will through the prosecution's file to discover whether anything therein might be of some value to the defense. This court is of the opinion that the trial court did not err in refusing to order the production of the material sought by the appellants.

### 7—RCr 7.26

A witness, Rebecca Thompson, identified the appellant Pankey as having been at the scene of the murder. She had previously mistakenly identified a photograph of the appellant Spears on three different occasions as the person she saw at the scene of the murder. She attempted to explain this discrepancy by stating that the photographs which she identified were not good likenesses of the subjects but she was positive of her in-person identification.

Appellants moved pursuant to RCr 7.26 for the production of any statements of this witness in the possession of the Commonwealth and they were furnished with a signed statement of the witness. The Commonwealth said the statement furnished was the only signed statement of the witness in its files. The appellants also demanded production of the photographs which were exhibited to this witness which demand was denied.

■ Under the circumstances we are of the opinion that the photographs in question had material value and would have been subject to pretrial discovery under RCr 7.24(2), had the defendants been aware of their existence and materiality. There is no reason why they would not and should

not have been produced for inspection and use in cross-examining the witness after it became evident from her testimony that they had an important bearing on the accuracy of her identification. Upon proper motion they should be made available to the appellants for use in the preparation and retrial of the case.

■ There was no showing that the Commonwealth had in its possession any signed or substantially verbatim statement of the witness other than the one furnished. The failure to require production of police reports not purporting to contain substantially verbatim statements of the witness was not erroneous.

### 8—ADMISSIBILITY OF EXPERT TESTIMONY

The appellants offered the testimony of two alleged experts which was excluded by the court.

The first witness was an employee of the American Automobile Association and purported to be an expert upon the time required to drive given distances under varying conditions. His testimony was offered by Swaite and Pankey and was intended to prove the minimum time required to drive from Louisville, Kentucky, to Cicero, Illinois, under traffic conditions which prevailed over the Labor Day Holiday.

■ This witness was permitted to testify as to the distance between Louisville and Cicero but was not permitted to fix a minimum driving time under the conditions which prevailed over Labor Day. In view of the fact that the witness did not and could not have known all of the driving conditions which prevailed over that long stretch of highway during all of the hours involved, his testimony was not competent upon the point. Cases cited by appellants in which the knowledge of an expert has been put in testimony through the device of the hypothetical question are not in point because of the lack of knowledge here of the prevailing conditions.

Aside from the fact that traffic is usually heavier on a Labor Day weekend than it normally is—the alleged expert knew nothing of specific conditions. Without specific knowledge of the myriad things which appellants could have encountered and which would have produced delay, testimony as to minimum driving time would be little more than a guess.

The second expert purported to testify concerning the ability of people to accurately observe and relate what they see. His testimony was excluded from the jury but placed in the record by way of avowal. In substance he undertook to state that eyewitness testimony is subject to great inaccuracy and is often unreliable, its accuracy depending upon a number of factors such as the stress and emotions to which the witness was subjected. He testified as to results of tests administered under controlled conditions and to chances of inaccuracy shown by those tests.

■ He had not administered any test to any of the eyewitnesses which purported to test their individual capacity to observe and to relate what they had seen. His proffered testimony as to the inability of people generally to make accurate observations constituted an invasion of the province of the jury in assessing the credibility of the witnesses. Its exclusion was not erroneous.

### 9—FAILURE TO GRANT DIRECTED VERDICT

Appellants Pankey and Swaite contend the trial court erred in overruling their motion for a directed verdict.

■ It is true that the incriminating evidence against them was not as great as that against Pope and Spears—yet each of them was identified positively by one or more eyewitnesses. Although the possibility of a mistaken identification existed, the accuracy of the identification was a question for the jury. Merritt v. Commonwealth, Ky., 386 S.W.2d 727 (1965); Burton v. Commonwealth, Ky., 442 S.W.2d 583 (1969) and Dell v. Commonwealth, Ky., 433 S.W.2d 872 (1968). In this case we cannot say that the total evidence was so flimsy and unreliable that a reasonable man, after hearing it, must necessarily have been left with a reasonable doubt. It was therefore sufficient to support the verdict.

### 10—CRUEL AND UNUSUAL PUNISHMENT

All appellants argue that the imposition of a death penalty is a cruel and unusual punishment prohibited by the Constitution of the United States.

■ Although this question is currently pending before the United States Supreme Court in other cases, this court has repeatedly rejected the contentions and appellants have not advanced any argument to cause this court to alter its position. The death penalty was in use when the Constitution of the United States was written and there is no indication that the drafters of the Constitution considered it either cruel or unusual. Our decision is controlled by previous rulings on the question. Williams v. Commonwealth, Ky., 464 S.W.2d 244 (1971).

### 11—PAST CRIMINAL CONDUCT AND ASSOCIATION

Pankey testified to an alibi that he and Swaite could not have been in Louisville on September 1, 1967, because on that day they robbed the Pacemaker Supermarket in Belvedere, Illinois.

On cross-examination the Commonwealth's Attorney alluded to Pankey's business as being a professional robber and proceeded to cross-examine him about another robbery with which he had been charged and about his association with the other three defendants in various states. The nature of the questioning is shown from the following excerpts:

"Q Now, I want to ask you some questions about your business of robbery, that you referred to yesterday. You have been convicted of a felony, or felonies, is that true?

\* \* \* \* \* \*

A  I have been convicted of a felony.

Q  The question was, Pankey, tell this jury what states you've been in with Swaite in the past two years, since you've known him?

A  Arkansas, Missouri, Illinois and Wisconsin.

Q  And were you with Swaite in those states in the business that you have told this jury that you're in?

MR. JONES: Your Honor, objection.

BY THE COURT: Overruled.

MR. HEAVRIN: The only issue, Judge, is whether he was here on the 1st of September. All these other matters (inaudible)

THE REPORTER: I can't hear you over here.

MR. HEAVRIN: Well—

BY THE COURT: Come up.

(At bench, out of the hearing of the jury) If you can remember what he said yesterday while he was on the stand.

MR. HEAVRIN: He didn't mention being in any states—he didn't mention knowing Swaite. The only issue in question is whether he committed the robbery here on September the 1st. That is the only issue. The fact that he has been everywhere in the country with Joe Swaite has no relevancy to the issue.

BY THE COURT: Oh.

MR. HEAVRIN: Of whether he was here.

MR. JONES: Mr. Ousley says was he in these states with his business? Now, he's trying to infer that his business is armed robbery and that he was holding things all over the country. That is not in issue, how many other places he may or may not have held up.

BY THE COURT: You say it's not in issue.

MR. HEAVRIN: Certainly not.

BY THE COURT: Well, it's overruled.

MR. HEAVRIN: Exception.

BY THE COURT: We'll find out about that. (End of proceedings at bench, out of the hearing of the jury.)

By Mr. Ousley

Q  All right, answer the question, please, at the direction of the Court.

A  All of the states I've been in with Joe Swaite, some of them were on business, some of them were not.

\* \* \* \* \* \*

Q  Tell the jury what states you have been in with Spears?

MR. HEVEY: Same Objection, your Honor.

BY THE COURT: Overruled.

MR. HEVEY: Exception.

A  (No answer)

Q  Perhaps I can help you. The same states you've been in with Swaite, the the same states?

MR. LYON: Objection, your Honor, for the same reasons, irrelevancy.

A  Substantially, yes.

Q  All right. Tell the jury how long you've known Pope?

MR. LYON: Same objection.

BY THE COURT: Overruled.

MR. LYON: Exception.

A  Just a little over a year.

Q  Where did you meet Pope?

A  Racine, Wisconsin.

Q  What states have you been in with Pope?

MR. HEVEY: Continuing objection, your Honor.

BY THE COURT: Overruled.

MR. HEVEY: Exception.

A Illinois and Wisconsin.

Q That's the only two, Illinois and Wisconsin, that you've been in with Pope?

A The only two that I recall.

    \*    \*    \*    \*    \*    \*

Q \* \* \*. In February of 1967, *in your business*, were you not with your co-defendants, or part of them, in Madison, Wisconsin?

MR. HEVEY: Continuing objection, your Honor.

BY THE COURT: Overruled.

MR. HEVEY: Exception.

A I was with part of them.

Q Will you name those whom you were with, please?

A Leonard Spears and Joe Swaite.

MR. LYON: Move for mistrial in regard to Spears.

BY THE COURT: Overruled.

MR. LYON: Exception.

By Mr. Ousley

Q Tell this jury what you, Spears and Swaite were doing in Madison, Wisconsin?

MR. HEVEY: Objection, your Honor.

MR. JONES: (At bench, out of the hearing of the jury) As Mr. Ousley well knows they have been indicted for robbery that day. I feel if he's forced to answer this question it would be self-incrimination, and any others; on his past activities he does not have to incriminate himself.

BY THE COURT: I imagine that what the Commonwealth is trying to bring out, I don't know whether he can or not, is minute detail of the robbery that they were supposed to have committed and that he testified that they committed and wherabouts was it, Belvedere, Illinois?

MR. JONES: Yes.

BY THE COURT: The description of that robbery and everything taking place—

MR. MILLER: (Interrupting) Well, your Honor, he's asking the question—he's asking the question pertaining to something occurring in February of 1967.

MR. JONES: Some five months earlier.

MR. MILLER: The implication, by the question, is that there was a criminal act of some sort at that time and he's asking him to describe it, which is in complete violation of Cowan vs. Commonwealth.

BY THE COURT: I don't think he's —

MR. JONES: (Interrupting) He asked them what they were doing and they've been indicted for robbery on that day.

BY THE COURT: All right.

MR. JONES: They haven't been convicted but they've been indicted.

BY THE COURT: So what?

MR. JONES: Well, if he has to answer the question he may have to incriminate himself on a robbery that day. And a man doesn't have to—

BY THE COURT: (Interrupting) did you ever hear of this rule of law, Counsellors, and all of you, Mr. Hevey, Mr. Lyon have been practicing a long time, examination to prove a pattern?

MR. JONES: Right, your Honor.

BY THE COURT: All right. Overruled.

MR. JONES: But he's asking about crimes that are not—

BY THE COURT: (Interposing) To prove a pattern. You've read that, haven't you? You know about that, don't you?

MR. JONES: He's not been convicted of any offense. He's admitted he was an armed robber; he's admitted the pattern.

BY THE COURT: Overruled.

MR. JONES: Exception.

BY THE COURT: I'll stand by it, overruled.

MR. HEVEY: Judge, I have a motion to offer. Your Honor, for the record, again at this time we request that a mistrial be declared and the jury be discharged under the decision of Na-pue, N-a-p-u-e, v. Illinois, 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217], on the basis of the misconduct on the part of the prosecution in presenting the case, that it has created a denial of due process to the defendants, Pope and Spears.

BY THE COURT: Overruled.

MR. HEVEY: Exception.

(End of proceedings at bench, out of the hearing of the jury.)

BY THE COURT: Mr. Ousley, proceed.

MR. OUSLEY: May the Commonwealth have an answer to the question?

BY THE COURT: Yes sir.

By Mr. Ousley

Q Will you answer the question, please?

A You'll have to repeat the question.

Q I will repeat it. What were you, Swaite and Spears doing in Madison, Wisconsin?

MR. HEVEY: Same objection, your Honor.

BY THE COURT: Overruled.

MR. HEVEY: Exception.

A We were charged with armed robbery. As to the details, as to our innocence or our guilt, the trial is still pending. And I shall take the Fifth Amendment and will not answer no questions on that case.

\*   \*   \*   \*   \*   \*

Q As I have stated, I am going to ask you a few more questions. If you do not care to answer, if you want to take the Fifth Amendment, just put it in the record, please.

What was the name of the robbery you and the others pulled? Who did you rob up there?

A I take the Fifth.

BY THE COURT: You take the Fifth Amendment.

THE WITNESS: I take the Fifth Amendment.

By Mr. Ousley

Q Was the name of the supermarket the Cole's, C-o-l-e-'-s, Supermarket?

A I take the Fifth Amendment.

Q Were you caught with the loot in your possession right there in the trunk of an automobile?

A Take the Fifth Amendment.

MR. JONES: (Interposing) Judge, this man isn't on trial for—

By Mr. Ousley

Q (Continuing) And it was the same modus operandi as you pulled in every robbery that you pulled. Correct? The stealing of a car, the use of two or more getaway cars, placing them three blocks from the scene of your robbery, going in with a gun and holding them up. Isn't that true. \* \* \*."

The appellants were entitled to be tried for the crime charged in the indictment and no other. Evidence which tends to prove the crime charged is admissible even though it may also show the commission of another offense. Evidence of conviction of other crimes is also admissible to show motive, intent, guilty knowledge, plan or system. Little v. Commonwealth, Ky., 419 S.W.2d 332 (1967); Bell v. Commonwealth, Ky., 404 S.W.2d 462 (1966) and Roberson's Kentucky Criminal Law and Procedure 2d, Section 1794. Under the limitations set forth in Cotton v. Commonwealth, Ky., 454 S.W.2d 698 (1970), evidence of conviction of other crimes is admissible for impeachment.

The testimony elicited during the cross-examination of Pankey concerning the robbery in Madison, Wisconsin, simply showed that Pankey, Spears and Swaite had been charged with, but not convicted of, that crime. Pankey denied his guilt and the others did not testify.

What is the relevancy of this testimony? The Attorney General argues that it was proper to show the circumstances of the Wisconsin robbery to show a recognizable pattern or plan used by the appellants there and in the Louisville robbery. The difficulty with that argument is that appellants have not been convicted of the Madison robbery and there was no proof of their guilt. The plan or pattern used in Madison was not necessarily a plan or pattern used by the appellants.

The fact that appellants were charged with a similar crime in Madison, Wisconsin, was no proof that they were guilty of that crime and certainly not proof of their guilt of a crime in Louisville. That evidence did tend to create an impression that appellants were a band of professional robbers. Pankey and Swaite of course had admitted one robbery but Pope and Spears had admitted nothing. The Commonwealth's Attorney attempted to expand the stigma which attached to Pankey as a result of his previous indictment to include Swaite, Pope and Spears by showing that they had associated with Pankey in a number of other states.

That Spears, Pope or Swaite may have associated with Pankey in any number of states, or even that they may have committed crimes therein, is no proof of the commission of the crime charged here. The admission of this evidence had an undeniable tendency to inflame and prejudice the jury against the appellants and invited the jury to determine the issue of guilt or innocence—and the punishment—upon a basis other than evidence pertaining to the charge. For this reason we have consistently condemned the introduction of evidence of conviction or commission of unrelated crimes except for the narrow purposes above noted. Powell v. Commonwealth, 308 Ky. 467, 214 S.W.2d 1002 (1948). The admission of evidence of the fact that Pankey, Swaite and Spears were charged with other separate crimes was erroneous and prejudicial.

## 12—HEARSAY EVIDENCE

Sandra Blassick, the wife of Richard Blassick was called as a witness for Pankey and Swaite. She corroborated their testimony that they were in Cicero, Illinois, on September 1, 1967, and that they participated with her husband in the robbery of the Pacemaker Supermarket in Belvedere on that day.

On cross-examination she was asked if her husband had, in her presence, told FBI agents that he did not plan or participate in the Pacemaker robbery; had called Pankey a liar for implicating him and had stated that he was willing to come to Louisville and testify that he did not commit the Pacemaker robbery with Pankey and Swaite. She denied that her husband had said these things.

The Commonwealth then produced an FBI agent, who testified that he interviewed Richard Blassick in the presence of Mrs. Blassick; that Blassick denied planning or participating in the Pacemaker robbery; that he said Pankey was a liar if he im-

plicated Blassick in that robbery and said he was willing to come to Louisville and testify that he did not participate in the Pacemaker robbery with Pankey and Swaite.

The jury was thus apprised of what Blassick had told the FBI agent. The Commonwealth does not contend this evidence was not hearsay but argues that it was admissible to impeach the credibility of Sandra Blassick.

■ Since Richard Blassick was not present as a witness, it would not have been competent for Mrs. Blassick to relate the substance of his conversation with an FBI agent. Her testimony as to what he said would have been hearsay. Her denial that he made the statements does not alter the situation. To allow the Commonwealth, upon her denial of the alleged conversation, to prove it under the guise of impeachment would give access through the back door to evidence which could not have come in the front.

■ Hearsay evidence is not rendered competent by the fact that it is elicited upon cross-examination under the guise of laying the foundation for impeachment. Lewis v. State, 108 Tex.Cr.R. 258, 1 S.W.2d 298 (1927); Weaver v. State, 120 Ohio St. 97, 165 N.E. 569 (1929), and Wharton's Criminal Evidence, Volume 1, 12th Edition, Section 249, page 573. The liberalized rule as to contradictory out-of-court statements as substantive evidence as announced in Jett v. Commonwealth, Ky., 436 S.W.2d 788 (1969), was limited to instances in which the person alleged to have made the statement appeared in court subject to cross-examination, and provided the statement would have been admissible if made by the declarant while testifying as a witness.

■ The testimony of the FBI agent as to what he was told by Richard Blassick was erroneously admitted in evidence. It directly refuted the alibi of Pankey and Swaite and was therefore prejudicial as to them.

■ Evidence was admitted that a Kentucky license plate bearing a number ending in 561 was found near the place where the white Ford automobile was recovered in Springfield, Illinois. The police officer who gave this testimony did not himself find the license plate nor did he know of his own knowledge who did find it or where it was found. His testimony to that extent was hearsay and was erroneously admitted. The testimony was vital because it was the only evidence which linked the white Ford automobile recovered in Springfield with the white Ford automobile rented in Louisville on the day before the robbery by Pope. The evidence was prejudicial to Pope.

## 13—MISCONDUCT OF TRIAL JUDGE AND PROSECUTING ATTORNEY

This trial lasted eight days much of which time was expended in bitter recrimination among counsel and bickering between counsel and the trial judge.

■ Although a trial judge may be provoked by the tactics of defense counsel he must maintain an air of complete impartiality and do nothing which would indicate his personal feelings concerning guilt or innocence or demonstrate any bias against a defendant.

Counsel for various appellants have devoted more than forty pages of their voluminous briefs to detailing and discussing alleged misconduct of the trial judge. The allegations of error are so numerous that it would be impracticable to undertake a discussion of all of them. We will set forth a few exchanges between counsel and court which are indicative of the conduct complained of.

At one point the court overruled a defense motion with this comment:

"Counsel has probably forgotten that the Commonwealth of Kentucky is entitled to representation too. And this is cross-examination."

At another point this colloquy took place:

"MR. HEAVRIN: Note the objections for Pankey to the remarks of the court and the failure to give the admonition.

BY THE COURT: The punks walked right into it."

On another occasion the trial judge was profusely complimentary of the testimony of the Commonwealth's fingerprint expert.

The following exchange took place during the closing argument by the Commonwealth's Attorney:

"MR. HEVEY: (Interrupting) Your Honor, objection.

BY THE COURT: (Rapping bench)

MR. LYON: Now, that—Mrs. Lochridge—

BY THE COURT: Wait a minute. (unintelligible) when defense counsel were making their closing arguments. Now, we're not going to have much of this. I'll assure you of that.

MR. HEVEY: (At bench, out of the hearing of the jury) Your Honor, at this time we'll object on the basis that counsel, and he knows quite well, that he is improperly bringing before the jury the prior criminal record of one of these defendants, a defendant who did not take the stand, and this is absolutely prejudicial.

At this time we'll ask for a mistrial and and ask that the jury be discharged.

BY THE COURT: Overruled.

MR. HEVEY: Exception.

(End of proceedings at bench, out of the hearing of the jury.)

BY THE COURT: Proceed.

MR. OUSLEY: Thank you, your Honor.

And so the prints were sent there in September and they had them, and the word came immediately back, 'They're Spears' prints.' And when he was arrested in March his prints were rolled here, again sent back to the FBI, and again it comes back, 'They're Spears' prints.'

MR. LYON: Objection, for the record on the—

BY THE COURT: (Interrupting and rapping bench) Every counsel for the defendants, not only made a closing argument but in the absence of any objection by the Commonwealth's Attorney, they have testified before this jury.

Are you getting that in the record, Miss Margaret, what I am saying?

THE REPORTER: Yes sir.

BY THE COURT: It speaks for itself. There will be no interruptions. Mr. Ousley did not object to your—whatever it was, speech or statement. He did not object to Mr. Hevey and, of course, he did not object to Mr. Heavrin.

MR. HEVEY: Your Honor, may it please the Court, the only (unintelligible)—

BY THE COURT: (Rapping bench and interrupting) I can take care of this in five minutes, even before the jury, I'll take care of. No more of it.

Proceed.

MR. LYON: (Aside) We object to this entire proceeding."

Throughout the trial, the judge made numerous disparaging remarks reflecting upon the abilities of defense counsel. These remarks were made in the courtroom, although in some instances the court reporter has indicated that they were made outside the hearing of the jury. We can only speculate how the court reporter knew what the jury could or could not hear but in any event we regard the intemperate and injudicious remarks the trial judge made throughout the case as evidence of a judicial bias against the appellants which the jury could not help but notice.

Other errors asserted by appellants include the failure to grant a change of venue,

the failure to separate witnesses, improper argument by Commonwealth's Attorney, improper comment upon the instructions by the trial judge and the use of perjured testimony by a police officer who testified for the Commonwealth. We find no basis for the allegation that the testimony of a police officer was perjured and the other alleged errors which we have not discussed in this opinion are unlikely to reoccur upon another trial.

This was a case in which alert citizens and efficient police work combined to produce an impressive case against the appellants. The Commonwealth was not content, however, to rest its case upon the solid foundation of competent incriminating evidence but elected to garnish the case with incompetent and inflammatory testimony. The rules of law prohibiting such testimony are as old as the Commonwealth and it remains a constant mystery to this court why prosecuting attorneys in their zeal to obtain a conviction will unnecessarily hazard a reversal of the judgment and the great expense and inconvenience attendant upon a retrial.

The judgment is reversed.

All concur.