660 P.2d 1208

STATE of Arizona,
Appellant/Cross-Appellee,

v.

Dolan CHAPPLE,
Appellee/Cross-Appellant.

No. 5054.

Supreme Court of Arizona,
En Banc.

Jan. 11, 1983.

Rehearing Denied March 1, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Jack Roberts, Asst. Attys. Gen., Charles F. Hyder, Maricopa County Atty. by Marc Budoff, Deputy County Atty., Phoenix, for appellant/cross-appellee.

Henry, Kimerer, LaVelle & Erlichman by Michael D. Kimerer, Pamela J. Franks, Randall J. Kries, Phoenix, for appellee/cross-appellant.

FELDMAN, Justice.

Dolan Chapple was convicted on three counts of first degree murder, one count of unlawfully transporting marijuana and one count of conspiring to unlawfully transport marijuana. He was sentenced to a term of life imprisonment without possibility of parole for twenty-five years on each of the murder counts, to a term of imprisonment for not less than twenty-five years nor more than life on the transportation count, and to a term of imprisonment for not less than twenty-five nor more than thirty years on the conspiracy count. The sentence on each count is to run concurrently with the sentences on all other counts. The defendant appealed from this judgment and sentence. This court has jurisdiction pursuant to A.R.S. § 13–4031.

## FACTS

The instigator of this bizarre drama was Mel Coley, a drug dealer who resided in Washington, D.C., but who was also connected with dealers in Kansas City. Coley had a history of dealing with a supplier named Bill Varnes, who lived near Phoenix. In fact, Coley, Varnes and a man named James Logan had been arrested once near

Yuma, Arizona in connection with a heroin transaction. Release was accomplished fairly quickly, giving rise to a suspicion in Coley's mind that someone had "talked" to the authorities.

Coley had made a large number of drug deals through Malcolm Scott, a "middleman" who lived near Phoenix. Scott was also well acquainted with Varnes and had recently returned from Kansas City, where Scott had helped Varnes in a drug transaction involving marijuana and probably some heroin. The trip to Kansas City was not without complications, since Varnes had been "holding-out" on the Kansas City dealers who were purchasing from him. They were unhappy over this and had threatened to take whatever action is appropriate in the drug business to collect the money they felt Varnes owed them. Coley evidently was involved in these problems and shared the feelings of his Kansas City colleagues toward Varnes.

Coley telephoned in early December 1977 and told Scott that he was interested in purchasing approximately 300 pounds of marijuana. He asked Scott to act as middleman in the transaction. Scott was to get $700 for his efforts. Scott testified that he called one or two of the Arizona suppliers with whom he was acquainted and found they could not supply the necessary quantity. He then called his sister, Pamela Buck, who was a "good friend" of Varnes and had worked with him in some drug deals. Scott asked Buck to contact her friend Varnes and see whether he could handle the sale.[1] Buck talked to Varnes and reported to her brother that Varnes could supply the necessary amount of marijuana at an agreed upon price. Scott relayed this information to Coley. Scott instructed Buck not to tell Varnes that Coley or anyone from Washington, D.C. was involved in the deal.

On the evening of December 10 or the early morning of December 11, 1977, Coley arrived at the Phoenix airport from Washington, D.C. Scott met him at the airport and found that Coley was accompanied by two strangers who were introduced as "Dee" and "Eric."[2] Scott drove the three men to a trailer located at his parents' farm near Higley in Pinal County, Arizona. Scott had used this trailer in the past as a meeting place to consummate drug transactions. This meeting place was part of the service which Scott provided for his "finder's fee."

Coley, Dee and Eric spent the night at the trailer, while Scott returned to his residence in Mesa. The next morning Scott returned to the farm and took Coley to the airport where they picked up a brown leather bag. Back at the trailer, Scott observed Coley, Eric and Dee take four guns from the bag and clean them. Scott examined and handled one of the guns. Buck had also arrived at the trailer in Higley, and she and Dee were dispatched to Varnes' trailer in order to purchase a sample of the marijuana.

Later that morning the conversation between Coley, Eric and Dee indicated that it was likely there would be a "rip-off" of the marijuana and that Coley did not intend to pay for the goods. When Buck expressed to her brother the fear that Varnes would seek revenge if his goods were stolen, Scott told her not to worry because Varnes might never be seen again.

That evening, Scott and his sister met at the trailer with Coley, Eric and Dee. Varnes arrived with two companions, Eduardo Ortiz and Carlos Elsy. Ortiz and Elsy began to unload the marijuana and put it in the trailer. Buck was in the trailer with Coley, Eric and Dee at this time. Scott was some distance away, sitting on the porch of his parents' house. Buck was

1. The record does not explain why Scott, who had recently returned from the Kansas City trip with Varnes, did not call Varnes personally. As will appear later, it is possible that Buck was used as an intermediary to keep Varnes from suspecting that anyone connected with the Kansas City drug ring was involved in the transaction. Varnes knew Coley was so connected.

2. Scott's testimony on this point is somewhat inconsistent, but it appears that the two men were actually introduced as "Eric Logan" and "Dee Davis" or "David Davis."

told by Dee or Coley that after the marijuana was unloaded she should lock herself in the bathroom.

After Ortiz and Elsy had finished unloading the marijuana and stacking it in the living room of the trailer, Dee suggested to Varnes that they go in the bedroom and "count the money." They started toward the bedroom and Buck went into the bathroom. A few moments later, Buck heard several shots, opened the bathroom door and ran out. Scott heard the shots while he was on the porch and saw a door of the trailer open. Elsy ran out, pursued by either Eric or Dee. After seeing Buck run out of the door at the other end of the trailer, Scott went back to the trailer and found Varnes dead in the bedroom of a gunshot wound to the head and Ortiz in the living room dead of a gunshot wound to the body. Subsequent ballistic tests showed they had been shot with different weapons. Elsy was outside, dead from a blow to the back of the head.

Dee and Eric then removed the marijuana from the trailer and loaded it into a car which Coley had directed Scott to buy the previous day.[3] Scott, Eric and Dee loaded the three bodies into the trunk of Varnes' car. That car was driven out to the desert, doused with gasoline and set afire. The trailer was cleaned to remove evidence of the crime and the carpet in the trailer was burned. The parties then left the scene of the crime and returned to Scott's house in Mesa. Eric and Dee asked for directions regarding the route to Kansas City and then left in the car containing the marijuana. Coley gave Scott and Buck $500 each. He then called the airport and reserved a seat to leave for Washington, D.C. under the name of "James Logan." Scott returned to the trailer and completed the cleanup. Fear or remorse, or both, drove Scott to seek the aid of a lawyer, who succeeded in negotiating an immunity deal for Scott and in getting him to surrender to the sheriff.

Defendant does not contest any of the foregoing facts. Defendant is accused of being "Dee." He denies this. At his extradition hearing in Illinois, seven witnesses placed him in Cairo, Illinois during the entire month of December 1977, three of them testifying specifically to his presence in that town on December 11, the day of the crime. The same witnesses testified for him in the trial at which he was convicted. No direct or circumstantial evidence of any kind connects defendant to the crime,[4] other than the testimony of Malcolm Scott and Pamela Buck, neither of whom had ever met the defendant before the crime and neither of whom saw him after the crime except at the trial. Defendant was apprehended and tried only because Malcolm Scott and Pamela Buck picked his photograph out of a lineup more than one year after the date of the crime; he was convicted because they later identified both the photographs and defendant himself at trial.

The State's position was that the identification was correct, while the defendant argued at trial that the identification was erroneous for one of two reasons. The first reason advanced by defendant is that Scott and Buck were lying to save themselves by "fingering" him. To buttress this contention, defendant established that Scott and Buck had made a "deal" with the State whereby they were granted complete immunity for their part in the crime unless the facts showed that they had knowingly participated in the killings. Defendant also argues that Coley, who did not testify at the trial, is part of the "arrangement" with the State since he, too, made a deal by entering into a plea bargain for second degree murder with a sentence of ten to fifteen years. Eric being still at large, this left defendant, who was identified initially only through photographs, as the sole object of prosecution. These contentions were evi-

---

3. Coley had given Scott $1,200 to buy a car. Scott got the car from "Harry the repo man" for $800, pocketing the difference.

4. Neither Coley, Eric nor Dee wore gloves during the events described. Latent fingerprints were found in the trailer and the vehicle containing the bodies, but did not match defendant's fingerprints.

dently rejected by the jury and are not in issue here.

Defendant further argued at trial, and urges here, that even if Scott and Buck are not lying, their identification was a case of mistaken identity. The argument is that Scott and Buck picked the wrong picture out of the photographic lineup and that their subsequent photographic and in-court identifications were part of the "feedback phenomenon" and are simply continuations or repetitions of the same mistake. To support this contention of mistaken identification, defendant offered expert testimony regarding the various factors that affect the reliability of identification evidence. For the most part, that testimony was rejected by the trial court as not being within the proper sphere of expert testimony.

With these facts in mind, we consider the various issues raised by this appeal. Where necessary, additional facts will be given in connection with each of those issues.

### THE PHOTOGRAPHIC LINEUP

On appeal, the defendant first contends that he was denied due process of law because the photographic lineup from which he was identified was unnecessarily suggestive.

In *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), the United States Supreme Court held that "convictions based on eyewitness identifications at trial following a pretrial identification by photograph will be set aside ... only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

■ The Supreme Court has developed a two-step analysis which is to be applied in determining whether a defendant has been denied due process of law because of a suggestive pretrial identification procedure. *Manson v. Brathwaite,* 432 U.S. 98, 109–14,

97 S.Ct. 2243, 2250–53, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). Under this analysis, the trial court must first determine whether the pretrial identification procedure was unnecessarily suggestive. If it is found to be unnecessarily suggestive, the court must then examine the totality of the circumstances surrounding the identification in order to determine the reliability of the identification. *Id.* The questions of suggestibility and reliability are factual issues and their determination is therefore within the trial court's discretion. *State v. Kelly,* 123 Ariz. 24, 26–27, 597 P.2d 177, 179–80 (1979).

■ Turning to the facts of this case, the defendant contends that the photographic display from which he was identified was unnecessarily suggestive because the hair of the persons shown in the photographs was cropped short to make it more closely resemble the witnesses' description of Dee's hair.[5] We disagree. Since the hair on all nine of the photographs was shortened, we fail to see any abuse in the trial court's finding that the alteration in the photographs did not influence the witnesses' identification of the defendant's picture as Dee. *Compare State v. Alexander,* 108 Ariz. 556, 503 P.2d 777 (1972) (photographic identification procedure held unnecessarily suggestive where out of the 17 photos shown the witness, only the two depicting the defendant had been altered to include a mustache and goatee); *Styers v. Smith,* 659 F.2d 293 (2d Cir.1981) (photographic identification procedure held unnecessarily suggestive because the photos of the suspects were in color, while the rest were in black and white); *State v. Henderson,* 116 Ariz. 310, 569 P.2d 252 (App.1977) (lineup was unnecessarily suggestive because made up of individuals twelve to sixteen years younger than suspect).

■ The defendant also contends that the photographic display was unnecessarily

---

**5.** The initial descriptions which the police obtained from Scott and Buck were similar. "Dee" was described as dark and short, with short hair. Buck said he had a mustache.

Scott said he was "cleanshaven." The witnesses from Cairo testified that defendant always wore his hair long, in "Afro" style.

suggestive because of the location of his photo in that display. The photographs were arranged in the December 27, 1978 lineup as follows:

|      |      |      |
|------|------|------|
| # 1  | # 2  | # 3  |
| # 4  | # 5  | # 6  |
| # 7  | # 8  | # 9  |

Photograph # 6 was a picture of the defendant. Photograph # 7 is the picture of the person whom Buck and Scott had previously tentatively identified as "Eric." The defendant contends that the fact that his photograph numerically preceded that of Eric in the photographic lineup was unnecessarily suggestive. We disagree. If position alone was sufficient to influence the witnesses' choice, # 8, who was not the defendant, had an equal or greater chance of being selected as Dee. *Cf. United States v. Bruner,* 657 F.2d 1278, 1294 (D.C.Cir. 1981).

We conclude that the trial court did not abuse its discretion in holding that the photographic display from which the defendant was identified was not unnecessarily suggestive.[6] Therefore, we need not reach the question of reliability.

**6.** Another, more serious, question of suggestibility is present here, though not raised by either party. One of the strange and unexplained threads in this case is the name and identity of James Logan. Logan was apprehended with Varnes and Coley in Yuma several years before the incident which led to Varnes' death. Logan was a known associate of Mel Coley in the drug business. When Malcolm Scott met Coley at the Phoenix airport on the night before the killings, Eric was introduced as "Eric Logan." When Coley left Phoenix after the murders, he booked airline tickets under the name "James Logan." When Scott gave the police a statement after turning himself in following the murders, he used the name Mel "Cotey" in identifying the instigator of the crime. The police obtained photographs from the Washington, D.C. police department of known drug dealers with names similar to "Mel Cotey" and showed them to Scott. Among these photographs was the photograph of "Mel Coley" which was immediately identified by Scott and later by Buck. At the same session on December 16, 1977, Scott pointed to another photograph in the group which had been shown him and said that that "looks like Dee."

## INFLAMMATORY PHOTOGRAPHS

Defendant contends that the trial court erred by admitting pictures of the charred body and skull of the victim, Bill Varnes. The four pictures were admitted in conjunction with the testimony of Detective Hanratty, the investigating officer, and Dr. Thomas Jarvis, the medical examiner. In vivid color, the photographs portray Varnes' burned body, face and skull, the entry wound of the bullet, a close-up of the charred skull with a large bone flap cut away to show the red-colored, burned dura matter on the inside rim of the skull with the pink brain matter beneath and a pencil pointing to the location of the bullet embedded in the brain. The last photograph shows the brain as the bullet is being removed. On appeal, defendant contends that these pictures were gruesome and inflammatory and therefore should not have been admitted.

We have previously stated the law on this issue as follows:

Photographs having probative value are admissible in evidence whether they are in black and white or color. *They must, of course, be relevant* to an issue in the case and may be admitted in evidence to

The photograph in question was not that of Dolan Chapple; it was a picture of James Logan. So far as the record shows, there was no follow-up made of this comment by Malcolm Scott. More than one year later, on January 27, 1979 when Scott was shown the cropped-hair photographic lineup from which he first picked a picture of Dolan Chapple and identified him as "Dee," there was no picture of James Logan, cropped or uncropped, included. Given the long time lag between the event and the identification of Dolan Chapple and the immediacy of the recognition or semi-recognition of James Logan's photograph, it is certainly arguable that the omission of Logan's picture, with cropped hair, from the lineup of January 27, 1979, which contained pictures of Eric and Dolan Chapple, improperly tainted the identification. It certainly raises an interesting question, which will never be answered: which photos would Scott have chosen if he had seen a photographic lineup which included cropped-hair photos of Eric, Dolan Chapple *and* James Logan? This question is perhaps more relevant to the issue of expert testimony and it will be considered in that section of the opinion.

identify the deceased, to show the location of the mortal wounds, to show how the crime was committed and to aid the jury in understanding the testimony of the witnesses. *If the photographs have any bearing upon any issue in the case, they may be received although they may also have a tendency to prejudice the jury against the person who committed the offense.* The discretion of the trial court will not be disturbed on appeal unless it has been clearly abused.

*State v. Mohr,* 106 Ariz. 402, 403, 476 P.2d 857, 858 (1970) (citations omitted) (emphasis supplied).

■ The facts of this case and the presence of the issue of inflammatory photographs in many other cases recently argued to this court lead us to reexamine the often quoted language from *State v. Mohr.* That language should not be interpreted to mean that any photograph which is relevant may be admitted despite its tendency to prejudice the jury. If this were the rule, any photograph of the deceased in any murder case would be admissible because the fact and cause of death are always relevant in a murder prosecution. Relevancy is not the sole test of admissibility for the trial court. Where the offered exhibit is of a nature to incite passion or inflame the jury—and the photographs in the case at bench certainly fall within that category—the court must go beyond the question of relevancy and consider whether the probative value of the exhibit outweighs the danger of prejudice created by admission of the exhibit. *State v. Beers,* 8 Ariz.App. 534, 538–40, 448 P.2d 104, 108–10 (1968). *Beers* correctly points out that after the relevancy question has been satisfied, the court must then apply Wigmore's Rules of Auxiliary Probative Policy, 4 Wigmore, *Evidence* § 1171 (3d ed. 1940). We first adopted this rule in these words:

> "Relevancy is thus not the sole test of the admissibility of evidence; admissibility depends, rather, on a balancing of the various effects of the admission of such evidence, considered in the light of recognized rules of law governing the administration of criminal justice."

*State v. Beers,* 8 Ariz.App. at 539, 448 P.2d at 109 (quoting *State v. Little,* 87 Ariz. 295, 307, 350 P.2d 756, 763 (1960)). The Wigmore test has since been codified in Rule 403, Ariz.R. of Evid., 17A A.R.S.

■ Thus, the correct rule is that exhibits which may tend to inflame the jury must first be found relevant. The trial court must then consider the probative value of the exhibits and determine whether it outweighs the danger of prejudice. *State v. Beers, supra;* Rule 403, supra. In making this determination, the trial court must examine the purpose of the offer. In *State v. Thomas,* 110 Ariz. 120, 515 P.2d 865 (1973), we identified the following uses for which photographs of a corpse may be admitted in a homicide prosecution: to prove the corpus delicti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed. *Id.* at 130, 515 P.2d at 875. If any of these questions is contested, either expressly or implicitly, then the trial court may find that the photographs have more than mere technical relevance; it may find that the photographs have "bearing" to prove a contested issue in the case and may, therefore, be admissible notwithstanding a tendency to create prejudice. *State v. Mohr, supra.*

However, if the photographs have no tendency to prove or disprove any question which is actually contested, they have little use or purpose except to inflame and would usually not be admissible. *State v. Steele,* 120 Ariz. 462, 464–66, 586 P.2d 1274, 1276–78 (1978); *State v. Powers,* 117 Ariz. 220, 223–24, 571 P.2d 1016, 1019–20 (1977); *State v. Makal,* 104 Ariz. 476, 478, 455 P.2d 450, 452 (1969); *People v. Wallach,* 110 Mich.App. 37, 67, 312 N.W.2d 387, 402 (1981).

■ In this case the State had the burden of proving all the elements of first degree murder as well as responding to

defendant's sole argument that he was not Dee. In meeting this burden, the State not only had to establish that the defendant was at the scene of the crime, but also that he was responsible for murder. The State argues that the photographs were relevant to these purposes for several of the reasons enumerated in *Thomas, supra.* We agree that the photographs were relevant to the issues raised by the State's burden of establishing a case for first degree murder. We also agree with the State's claim that the photographs are useful to prove that Dee (who told Buck that he had "shot that _____ _____ in the head") had committed one of the killings.

While both of these arguments establish the relevancy of the photographs, under the facts of this case we find they had little probative value. The fact that Varnes was killed, the medical cause of his death, and what was done with his body after death were not in controversy. The defense did not dispute, controvert or contradict the State's testimony from the two witnesses on this subject, Detective Hanratty and Dr. Jarvis, and even offered to stipulate to the cause of death. The facts illustrated in the photographs were simply not in dispute or at issue. As the prosecution accurately told the jury in final argument, the only issue to be tried was whether Malcolm Scott and Pamela Buck were correct in identifying the defendant as Dee.

While the exhibits did illustrate the testimony of Hanratty and Jarvis and thus helped the jury comprehend that testimony,[7] there was simply no conflict with regard to the point at which the bullet entered Varnes' skull, the depth of its penetration, the lobe of the brain in which it

was lodged, the damage which it did, or over whether it or some other condition had caused death. Nor was there any value to the photographs on the theory that they were relevant to Buck's testimony that after the killings Dee admitted that he had shot Varnes in the head. This admission may well serve to establish that Dee was the one who killed Varnes, but defendant did not deny that Dee had killed Varnes by shooting him in the head. Defendant argued only that he was not Dee. The photographs showing the bullet hole in the skull and the bullet in the burned brain were not probative on the only issue being tried, which was whether defendant was Dee.

In summary, the narrow issue on which this case turned was identification. The matters illustrated by the photographs were cumulative of uncontradicted and undisputed testimony, as well as the subject of a stipulation offered by the defendant. We find, therefore, that the photographs in question had little probative value on the issues being tried and that their admission in evidence could have almost no value or result except to inflame the minds of the jury. Under such circumstances, there was nothing for the trial court to weigh, nothing on which its discretion could be exercised, and the admission of the photographs was error. *State v. Powers, supra; People v. Redston,* 139 Cal.App.2d 485, 293 P.2d 880 (1956); *Commonwealth v. Bastarache,* 10 Mass.App. 499, 409 N.E.2d 796 (1980); *State v. Allies,* Mont., 606 P.2d 1043 (1980); *Oxendine v. State,* 335 P.2d 940 (Okl.Cr.App. 1958); *State v. Poe,* 21 Utah 2d 113, 441 P.2d 512 (1968).

In reaching this conclusion, we recognize that the state cannot be compelled to try its

---

7. The trial judge admitted three of the photographs over objection, informing the jurors that the photographs were "distasteful, per-, haps to some even shocking. The ... sole purpose for which you are to consider their admission into evidence, is the fact that they do show where the slug which the detective described was in the skull of one of the victims." The detective and medical examiner both testified without contradiction to the area of the brain in which the bullet was found and the cumulative effect of the photographs could

serve no purpose under these facts. We do not believe that the court's statement to the jury regarding the purpose of the admission can be relied upon to negate the admittedly "shocking" effect of the photographs. *Compare State v. Vickers,* 129 Ariz. 506, 633 P.2d 315 (1981); *State v. Schad,* 129 Ariz. 557, 633 P.2d 366 (1981); *State v. Christensen,* 129 Ariz. 32, 628 P.2d 580 (1981), where photographs were not shocking *and* were probative of contested issues.

case in a sterile setting. Exhibits which have the tendency to cause prejudice may often be admissible despite offers to stipulate or the absence of controverting or contradicting evidence. Many times the accuracy of a witness' testimony is not conceded and can be better understood when illustrated by photographs. Testimony may be difficult to comprehend without photographs, or exhibits may corroborate or illustrate controverted testimony. In such cases, the exhibits have probative value on issues expressly or tacitly in dispute. In every case in which there is probative value to the exhibit, it is for the trial court to weigh that value against the danger of prejudice and its conclusion on this point will not be disturbed absent a clear abuse of discretion. *State v. Chatman,* 109 Ariz. 275, 279, 508 P.2d 739, 743 (1973).

■ In this case, however, there was nothing of significance to weigh and the only possible use of the photographs would have been to inflame the minds of the jury or to impair their objectivity. Since there was so little probative value to these photographs and since their capacity to inflame is obvious, the admission was legally erroneous and an abuse of discretion. The prejudicial effect will be considered later in the opinion.

## EXPERT TESTIMONY REGARDING EYEWITNESS IDENTIFICATION

On learning of Mel Coley's participation in the crime, the sheriff's office quickly procured photographs of Coley, which were shown to Scott and Buck in a photographic lineup on December 16, 1977. Both of them identified Coley, thus providing law enforcement with the first step in its efforts to apprehend Dee and Eric. The detectives then showed Scott and Buck various photographs and lineups containing pictures of known acquaintances of Mel Coley. At this same session, Scott pointed to a picture of James Logan and stated that it resembled

Dee, though he could not be sure. So far as the record shows, no follow-up was made of this tentative identification. One of the photographic lineups displayed to Scott, but not to Buck, contained a picture of the defendant, Dolan Chapple, but Scott did not identify him as Dee. At a time and in a manner not disclosed by the record, both Scott and Buck made a tentative identification of a photograph of Eric. The photograph portrayed Coley's nephew, Eric Perry.

The police continued to show the witnesses photographic lineups in an attempt to obtain an identification of Dee. Police efforts were successful on January 27, 1979, when Scott was shown a nine-picture photo lineup.[8] For the first time, this lineup included photos of both Eric Perry, who had already been tentatively identified by Scott and Buck, and of the defendant; however, James Logan's photo was not included. Upon seeing this lineup, Scott immediately recognized Eric's picture again. About ten minutes later, Scott identified defendant's picture as Dee. Scott was then shown the picture of defendant he had failed to identify at a previous session and asked to explain why he had not previously identified it. He stated that he had no recollection of having seen it before. After Scott had identified Dee and before he could talk to his sister, the police showed Buck the same lineup. Buck identified the defendant as Dee and then re-identified Eric.

Defendant argues that the jury could have found the in-court identification unreliable for a variety of reasons. The defendant argues that the identification of Dee from photographic lineups in this case was unreliable because of the time interval which passed between the occurrence of the event and the lineup and because of the anxiety and tension inherent in the situation surrounding the entire identification process.[9] The defendant also argues that since Scott and Buck had smoked marijuana

**8.** This was the lineup on which hair had been cropped.

**9.** Buck and Scott both said they were frightened for their lives during the events. Since they are the only witnesses, one might assume they were also frightened and apprehensive during the time period when Eric and Dee were both at liberty.

on the days of the crime, their perception would have been affected, making their identification through photographs less reliable. Further, defendant claims the January 27, 1979 identification of Dee by Scott and Buck from the photographic lineup was the product of an unconscious transfer. Defendant claims that Scott picked the picture of Dolan Chapple and identified it as Dee because he remembered that picture from the previous lineup (when he had not been able to identify defendant's picture). Defendant urges that the in-court identifications were merely reinforcements of the initial error. Defendant also argues that Eric's presence in the lineup heightened the memory transfer and increased the chance of an incorrect photographic identification. Defendant makes the further point that since the James Logan picture resembled defendant's and was not again displayed to the witnesses, the chance of misidentification was heightened. Further, defendant claims that the identification was made on the basis of subsequently acquired information which affected memory. Finally, defendant argues that the confidence and certainty which Scott and Buck displayed in making their in-court identification at trial had no relation whatsoever to the accuracy of that identification and was, instead, the product of other factors.

It is against this complicated background, with identification the one issue on which the guilt or innocence of defendant hinged, that defense counsel offered the testimony of an expert on eyewitness identification in order to rebut the testimony of Malcolm Scott and his sister, Pamela Buck. The witness called by the defense was Dr. Elizabeth Loftus, a professor of psychology at the University of Washington. Dr. Loftus specializes in an area of experimental and clinical psychology dealing with perception, memory retention and recall. Her qualifications are unquestioned, and it may fairly be said that she "wrote the book" on the subject. The trial court granted the State's motion to suppress Dr. Loftus' testimony. Acknowledging that rulings on admissibility of expert testimony are within the discretion of the trial court, defendant contends that the court erred and abused its discretion in granting the motion to suppress Dr. Loftus' testimony.

The admissibility of expert testimony is governed by Rule 702, Ariz.R. of Evid. That rule states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In what is probably the leading case on the subject, the Ninth Circuit affirmed the trial court's preclusion of expert evidence on eyewitness identification in *United States v. Amaral,* 488 F.2d 1148 (9th Cir.1973). In its analysis, however, the court set out four criteria which should be applied in order to determine the admissibility of such testimony. These are: (1) qualified expert; (2) proper subject; (3) conformity to a generally accepted explanatory theory; and (4) probative value compared to prejudicial effect. *Id.* at 1153. We approve this test and find that the case at bar meets these criteria.

We recognize that the cases that have considered the subject have uniformly affirmed trial court rulings denying admission of this type of testimony. However, a careful reading of these cases reveals that many of them contain fact situations which fail to meet the *Amaral* criteria or are decided on legal principles which differ from those we follow in Arizona. For instance, in one of the cases often cited on this subject, *United States v. Watson,* 587 F.2d 365 (7th Cir.1978), the court held that the expert testimony was properly precluded by the trial court because of the lack of the witness' qualifications and the fact that identification had been "prompt and positive" so that expert testimony would be of little use. *Id.* at 369. Neither of those grounds is applicable to the case at bench. Similarly, in another leading case, *United States v. Brown,* 540 F.2d 1048, 1053–54 (10th Cir.1976), the court pointed out that

there had been no real offer of proof and that expert evidence regarding eyewitness testimony would improperly invade the province of the jury [10] and would result in undue consumption of time. In the case presently before us, there was a detailed offer of proof, the consumption of time involved in taking the testimony of the expert witness in question was certainly not "undue" in comparison with the importance of the issue before the court, and the worry about invading the province of the jury has been solved for us by the provisions of Rule 704, Ariz.R. of Evid., which permits opinion testimony even though "it embraces an ultimate issue."

Applying the *Amaral* test to the case at bench, we find from the record that the State has conceded that the expert was qualified and that the question of conformity to generally accepted explanatory theory is not raised and appears not to be a question in this case. The two criteria which must therefore be considered are (1) determination of whether the probative value of the testimony outweighs its possible prejudicial effect and (2) determination of whether the testimony was a proper subject.

### (1) PROBATIVE VALUE vs. PREJUDICE

■ The State argues that there would have been little probative value to the witness' testimony and great danger of unfair prejudice. The latter problem is claimed to arise from the fact that Loftus' qualifications were so impressive that the jury might have given improper weight to her testimony. We do not believe that this raises the issue of *unfair* prejudice. The contention of lack of probative value is based on the premise that the offer of proof showed that the witness would testify to general factors which were applicable to this case and affect the reliability of identification, but would not express any opinion

with regard to the accuracy of the specific identification made by Scott and Buck and would not express an opinion regarding the accuracy percentage of eyewitness identification in general.

We believe that the "generality" of the testimony is a factor which favors admission. Witnesses are permitted to express opinions on ultimate issues but are not required to testify to an opinion on the precise questions before the trier of fact.

Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. [Rule 702] accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts. Since much of the criticism of expert testimony has centered upon the hypothetical question, it seems wise to recognize that *opinions are not indispensable* and to encourage the use of expert testimony in non-opinion form when counsel believes the trier can itself draw the requisite inference.

Fed.R. of Evid. 702 advisory committee note.

### (2) PROPER SUBJECT

The remaining criterion at issue is whether the offered evidence was a proper subject for expert testimony. Ariz.R. of Evid. 702 allows expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Put conversely, the test "is whether the subject of inquiry is one of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the witness . . . ." *State v. Owens,* 112 Ariz. 223, 227, 540 P.2d 695, 699 (1975). Furthermore, the test is not whether the jury could reach some conclusion in the absence of the

10. Several other cases hold that such testimony was properly refused on the basis that expert evidence on the reliability of eyewitness identification would invade the province of the jury. See *Caldwell v. State,* 267 Ark. 1053, 1059, 594 S.W.2d 24, 28–29 (App.1980); *People v. John-*son, 112 Cal.Rptr. 834, 836–37, 38 Cal.App.3d 1, 6–7 (1974); *James v. State,* 232 Ga. 762, 763–64, 208 S.E.2d 850, 852–53 (1974); *Pankey v. Commonwealth,* 485 S.W.2d 513, 521–22 (Ky.App.1972).

expert evidence, but whether the jury is qualified without such testimony "to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject...." Fed.R. Evid. 702 advisory committee note (quoting Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952)).

In excluding the evidence in the case at bench, the trial judge stated:

I don't find anything that's been presented in the extensive discussions that I have read in your memorandum with regard to the fact that this expert is going to testify to anything that isn't within the common experience of the people on the jury, that couldn't really be covered in cross-examination of the witnesses who made the identification, and probably will be excessively argued in closing arguments to the jury.

This basis for the view that eyewitness identification is not a proper subject for expert testimony is the same as that adopted in *United States v. Amaral, supra,* and in the great majority of cases which have routinely followed *Amaral. See, e.g., State v. Valencia,* 118 Ariz. 136, 138, 575 P.2d 335, 337 (App.1977); *People v. Guzman,* 121 Cal. Rptr. 69, 71–72, 47 Cal.App.3d 380, 385–86 (1975); *Dyas v. United States,* 376 A.2d 827, 831–32 (D.C.App.1977); *Nelson v. State,* 362 So.2d 1017, 1021 (Fla.App.1978); *People v. Dixon,* 87 Ill.App.3d 814, 818, 410 N.E.2d 252, 256 (1980); *State v. Porraro,* R.I., 404 A.2d 465, 471 (1979).

However, after a careful review of these cases and the record before us, we have concluded that although the reasons cited by the trial judge would correctly permit preclusion of such testimony in the great majority of cases, it was error to refuse the testimony in the case at bench. In reaching this conclusion, we have carefully considered the offer of proof made by the defense in light of the basic concept of "proper subject" underlying Rule 702.

We note at the outset that the law has long recognized the inherent danger in eyewitness testimony. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).[11] Of course, it is difficult to tell whether the ordinary juror shares the law's inherent caution of eyewitness identification. Experimental data indicates that many jurors "may reach intuitive conclusions about the reliability of [such] testimony that psychological research would show are misguided." Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 Stan.L.Rev. 969, 1017 (1977).

Even assuming that jurors of ordinary education need no expert testimony to enlighten them to the danger of eyewitness identification, the offer of proof[12] indicated that Dr. Loftus' testimony would have informed the jury that there are many specific variables which affect the accuracy of identification and which apply to the facts of this case. For instance, while most jurors would no doubt realize that memory dims as time passes, Dr. Loftus presented data from experiments which showed that the "forgetting curve" is not uniform. Forgetting occurs very rapidly and then tends to level out; immediate identification is much more trustworthy than long-delayed identification. Thus, Scott's recognition of Logan's features as similar to those of Dee when Logan's picture was shown at the inception of the investigation is probably a more reliable identification than Scott's identification of Chapple's photograph in the photographic lineup thirteen months later. By the same token, Scott's failure to

11. "The vagaries of eye-witness identification are well known: the annals of criminal law are rife with instances of mistaken identification.... 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials.'" Id. 388 U.S. at 228, 87 S.Ct. at 1933 (Brennan, J., quoting Frankfurter, J.).

12. The offer of proof was taken with Dr. Loftus on the stand and the jury excluded from the courtroom.

identify Chapple's photograph when it was first shown to him on March 26, 1978 (four months after the crime) and when Scott's ability to identify would have been far greater, is of key importance.

Another variable in the case is the effect of stress upon perception. Dr. Loftus indicated that research shows that most laymen believe that stressful events cause people to remember "better" so that what is seen in periods of stress is more accurately related later. However, experimental evidence indicates that stress causes inaccuracy of perception with subsequent distortion of recall.

Dr. Loftus would also have testified about the problems of "unconscious transfer," a phenomenon which occurs when the witness confuses a person seen in one situation with a person seen in a different situation. Dr. Loftus would have pointed out that a witness who takes part in a photo identification session without identifying any of the photographs and who then later sees a photograph of one of those persons may relate his or her familiarity with the picture to the crime rather than to the previous identification session.

Another variable involves assimilation of post-event information. Experimental evidence, shown by Dr. Loftus, confirms that witnesses frequently incorporate into their identifications inaccurate information gained subsequent to the event and confused with the event. An additional problem is the "feedback factor." We deal here with two witnesses who were related and who, according to Loftus' interview, engaged in discussions with each other about the identification of Dee. Dr. Loftus, who interviewed them, emphasized that their independent descriptions of Dee at times utilized identical language. Dr. Loftus would have explained that through such discussions identification witnesses can reinforce

their individual identifications. Such reinforcement will often tend to heighten the certainty of identification. The same may be said of the continual sessions that each witness had with the police in poring over large groups of photographs.[13]

The last variable in this case concerns the question of confidence and its relationship to accuracy. Dr. Loftus' testimony and some experimental data indicate that there is no relationship between the confidence which a witness has in his or her identification and the actual accuracy of that identification. Again, this factor was specifically tied to the evidence in the case before us since both Scott and Buck indicated in their testimony that they were absolutely sure of their identification. Evidently their demeanor on the witness stand showed absolute confidence.[14]

We cannot assume that the average juror would be aware of the variables concerning identification and memory about which Dr. Loftus was qualified to testify.

> Depriving [the] jurors of the benefit of scientific research on eyewitness testimony force[d] them to search for the truth without full knowledge and opportunity to evaluate the strength of the evidence. In short, this deprivation prevent[ed] [the] jurors from having "the best possible degree" of "understanding the subject" toward which the law of evidence strives.

Note, *supra,* 29 Stan.L.Rev. at 1017–18. Thus, considering the standard of Rule 702, *supra,*—whether the expert testimony will assist the jury in determining an issue before them—and the unusual facts in this case, we believe that Dr. Loftus' offered evidence was a proper subject for expert testimony and should have been admitted.

---

**13.** We do not suggest that the police attempted to prejudice the identification procedure. The facts show that the police were careful to avoid the possibility of prejudice. However, as Dr. Loftus pointed out, it is not possible to discuss identification of photographs with witnesses on seven different occasions, comprising a total of over 200 pictures, without giving the witness some "feedback" with respect to what the officers anticipate or expect the witness to find.

**14.** We base this conclusion on statements the prosecutor made in closing argument and in defense counsel's attempts to argue that the jurors should not be misled by the confidence which the witnesses displayed in their identification testimony.

Of course, the test is not whether we believe that under these facts the evidence was admissible, but whether the trial court abused its discretion in reaching the contrary conclusion. Our review of the record leads us to the following conclusions regarding the various factors which support admission or preclusion here. Among the factors considered are the following:

1. The facts were close and one of the key factual disputes to be resolved involved the accuracy of the eyewitness identification. The preclusion ruling undercut the entire evidentiary basis for defendant's arguments on this issue.

2. The testimony offered was carefully limited to an exposition of the factors affecting reliability, with experimental data supporting the witness' testimony and no attempt was made to have the witness render opinions on the actual credibility or accuracy of the identification witnesses. Issues of ultimate fact may be the subject of expert testimony, but witnesses are not "permitted as experts on how juries should decide cases." Ariz.R. of Evid. 704 comment.

3. On the other hand, we see no significant prejudice to the State in permitting the testimony; the problem of time is not present in this case, since time spent on the crucial issue of the case can not be considered as "undue" loss of time. No other significant factor weighing against admission of the evidence seems present.

4. No question exists with regard to three of the four criteria listed in *United States v. Amaral, supra,* being fulfilled by the factual situation present in this case.

5. The key issue here pertained to the fourth criterion—the question of whether Loftus' evidence was a "proper subject" for expert testimony.

As indicated above, the key to this issue is whether the testimony might assist the jury to resolve the issues raised by the facts. In making this determination, the trial court must first consider those contentions of ultimate fact raised by the party offering the evidence and supported by evidentiary facts in the record. It must then determine whether the expert testimony will assist in resolving the issues.

In our view, the record clearly shows that Dr. Loftus' testimony would have been of considerable assistance in resolving some of the factual contentions raised by the parties in this case. Examples follow:

First, the photographs in evidence show that there is a resemblance between Logan and Chapple. Scott told the police that Logan's photograph resembled Dee. Scott then failed to identify Chapple's photograph when it was first shown to him. Considering these facts, might Scott's comments regarding the Logan photographs be considered an identification? Should it be considered more accurate than his identification of Chapple from the photographic line-up almost one year later? Loftus' testimony regarding the forgetting curve would have assisted the jury in deciding this issue.

Second, assuming the jury disregarded, as was its right, Scott's and Buck's denial of having discussed Dee's description prior to the identification of January 27, 1979, did the feedback/after-acquired information phenomena play a part in Buck's identification of defendant on the cropped-hair line-up? We cannot assume that ordinary jurors would necessarily be aware of the impact of these factors.

Third. Logan and Chapple bear some resemblance. Logan's picture had been the object of some comment between Scott and the sheriff's deputies shortly after the killing. Although he professed to have no memory of it, Scott had seen a picture of the defendant within a few months of the shooting. Was Scott's identification of defendant on the January 27, 1979 lineup therefore influenced by an unconscious transfer of memory? Since Dee evidently looked like Logan and Chapple, was this transfer phenomenon with regard to their photographs more pronounced than it was with regard to other photographs which were shown to Scott on more than one occasion?

Fourth. Since a cropped-hair picture of Logan, who bore a resemblance to defend-

ant and was tentatively identified by Scott soon after the killing, was not included in the lineup of January 1979, were Scott and Buck given a reasonable choice with respect to the photos which they examined on the occasion on which they identified Chapple?

Fifth. The opportunity for perception by the witnesses in this case was great. Most of us would assume that where the opportunity for perception has been significantly greater than the usual case, the recall of the witness and the subsequent identification must be correspondingly more accurate than in most cases. The expert testimony may well have led to the opposite conclusion, though Dr. Loftus admitted that none of her experiments had been based upon situations where the opportunity for perception had been similar to that of the case at bench. Nevertheless, it is implicit in Loftus' testimony that even in cases such as this, the other factors described by her can have a significant impact on the accuracy of later identification.

Sixth, did the witnesses' absolute confidence in the identification bear any relationship to the accuracy of that identification? Again, contrary to Dr. Loftus' opinion, most people might assume that it would.

Each of the factual issues described above is raised by evidentiary facts in the record or reasonable inferences from those facts. In effect, the trial judge ruled that all of the information necessary to resolve the conflicting factual contentions on these issues was within the common experience of the jurors and could be covered in cross-examination of the identification witnesses and argued to the jury.

It is difficult to support this conclusion. For instance, while jurors are aware that lapse of time may make identification less reliable, they are almost certainly unaware

of the forgetting curve phenomenon and the resultant inference that a prompt tentative identification may be much more accurate than later positive identification. Similarly, cross-examination is unlikely to establish any evidentiary support for argument that eyewitnesses who have given similar nonfactual descriptions of the criminal may have been affected by the feedback phenomenon. Again, experimental data provides evidentiary support to arguments which might otherwise be unpersuasive because they seem contrary to common "wisdom." [15]

The phrase "within the discretion of the trial court" is often used but the reason for that phrase being applied to certain issues is seldom examined. One of the primary reasons an issue is considered discretionary is that its resolution is based on factors which vary from case to case and which involve the balance of conflicting facts and equitable considerations. *Walsh v. Centeio,* 692 F.2d 1239, 1242 (9th Cir.1982). Thus, the phrase "within the discretion of the trial court" does not mean that the court is free to reach any conclusion it wishes. It does mean that where there are opposing equitable or factual considerations, we will not substitute our judgment for that of the trial court.

Thus, while we have no problem with the usual discretionary ruling that the trier of facts needs no assistance from expert testimony on the question of reliability of identification, the unusual facts of this case compel the contrary conclusion. The preclusion ruling here was based upon a determination that the jury would not be assisted by expert testimony because the subjects embraced by that testimony could be elicited on cross-examination and argued without the evidentiary foundation. Preclusion here was not predicated upon a balancing of

---

15. This problem is apparent on review of final argument. One example is that counsel for the State continually emphasized the degree of certainty of the witnesses and argued the consequent accuracy of the identification. Defense counsel asked the jury not to be misled by the certainty of the witnesses and argued that even people who are wrong are sometimes certain of their identification. No doubt the jury could understand that idea without having heard expert testimony, but we think it fair to say that experimental evidence showing the lack of correlation between certainty and reliability of even truthful witnesses might have given the argument some persuasive force.

conflicting factual contentions [16] or equitable considerations; [17] it was based upon the court's own conclusion that scientific theory regarding the working of human memory could be developed on cross-examination and effectively argued without evidentiary foundation. The examples listed above demonstrate that under the facts here this conclusion was incorrect; there were a number of substantive issues of ultimate fact on which the expert's testimony would have been of significant assistance. Accordingly, we hold that the order precluding the testimony was legally incorrect and was unsupported by the record. It was, therefore, an abuse of discretion.[18] *Grant v. Public Service Company,* 133 Ariz. 434, 652 P.2d 507 (1982).

In reaching this conclusion, we do not intend to "open the gates" to a flood of expert evidence on the subject. We reach the conclusion that Dr. Loftus should have been permitted to testify on the peculiar facts of this case and have no quarrel with the result reached in the vast majority of cases which we have cited above. The rule in Arizona will continue to be that in the usual case we will support the trial court's discretionary ruling on admissibility of expert testimony on eyewitness identification. Nor do we invite opinion testimony in even the most extraordinary case on the likelihood that a particular witness is correct or mistaken in identification or that eyewitness identification in general has a certain percentage of accuracy or inaccuracy.

## PREJUDICE

Having found that the trial court erred and abused its discretion in admitting the inflammatory photographs and excluding the expert testimony, we must consider the question of prejudice. Error is prejudicial unless it can be said beyond a reasonable doubt that the jury would have convicted even in the absence of error at the trial level. *State v. Malloy,* 131 Ariz. 125, 129, 639 P.2d 315, 319 (1981); *State v. Jessen,* 130 Ariz. 1, 7, 633 P.2d 410, 416 (1981). Considering the erroneous admission of inflammatory photographs and preclusion of the expert testimony, we are not able to conclude that the jury would have convicted

---

**16.** *E.g.:* the qualifications of the witness, the validity of the data or the assumptions forming a predicate for the opinion.

**17.** *E.g.:* consumption of time, delay in trial or undue prejudice to the State.

**18.** The term "abuse of discretion" is unfortunate. In ordinary language, "abuse" implies some form of corrupt practice, deceit or impropriety. Webster's Third New International Dictionary (1976). In this sense, the application of the word to the act of a trial judge who ruled in accordance with all the decided cases on the issue is inappropriate. However, in the legal context, the word "abuse" in the phrase "abuse of discretion" has been given a broader meaning. In the few cases that have attempted an analysis, the ordinary meaning of the word has been considered inappropriate and the phrase as a whole has been interpreted to apply where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice. *State ex rel. Fletcher v. District Court of Jefferson County,* 213 Iowa 822, 831, 238 N.W. 290, 294 (1931). Similarly, a discretionary act which reaches an end or purpose not justified by, and clearly against, reason and evidence "is an abuse." *Kinnear v. Dennis,* 97 Okl. 206, 207, 223 P. 383, 384 (1924).

The law would be better served if we were to apply a different term, but since most appellate judges suffer from misocainea, we will no doubt continue to use the phrase "abuse of discretion." Therefore, we should keep some operative principles in mind. Something is discretionary because it is based on an assessment of conflicting procedural, factual or equitable considerations which vary from case to case and which can be better determined or resolved by the trial judge, who has a more immediate grasp of all the facts of the case, an opportunity to see the parties, lawyers and witnesses, and who can better assess the impact of what occurs before him. *Walsh v. Centeio, supra.* Where a decision is made on that basis, it is truly discretionary and we will not substitute our judgment for that of the trial judge, we will not second-guess. Where, however, the facts or inferences from them are not in dispute and where there are few or no conflicting procedural, factual or equitable considerations, the resolution of the question is one of law or logic. Then it is our final responsibility to determine law and policy and it becomes our duty to "look over the shoulder" of the trial judge and, if appropriate, substitute our judgment for his or hers. This process is sometimes, unfortunately, described as a determination that the trial judge has "abused his discretion." In that sense, we determine that this trial judge did.

in the absence of error and must therefore reverse. Our decision to reverse moots several of the other issues raised by the defense, and also moots the appeal taken by the State in which it claims that the trial court erred in failing to impose the death penalty.

The only remaining issue relates to defendant's contention that he should be acquitted because of violation of his constitutional rights in the appeal period.

## APPEAL DELAY

Defendant contends that the court should enter an order of acquittal because he was denied due process and equal protection of the laws due to the court reporter's failure to file the trial transcripts in a timely manner.

The defendant was convicted on July 11, 1980 on all counts charged. He filed a timely notice of appeal. The court reporter, however, failed to transcribe and file the record on appeal with this court although she was ordered twice to do so (September 3, 1980 and March 13, 1981) by the Chief Justice of this court. On April 17, 1981, defense counsel filed a petition for post conviction relief, alleging that defendant had been denied his constitutional rights because the trial transcript in this case had not been filed with the Arizona Supreme Court despite the two orders to do so. Shortly thereafter, defendant received notice that the record on appeal was completed on April 11, 1981 and that an opening brief would be due July 14, 1981. However, on June 26, 1981, it was discovered that the transcripts were still not complete. On June 30, 1981, the defendant filed a motion to continue, a motion for sanctions requesting that the court reporter be held in con-

tempt, and a motion for a new trial. On July 7, 1981, the defendant's motion for a new trial was denied and the court reporter was ordered to appear before this court on July 14, 1981 to show cause why sanctions should not be imposed.[19] Finally, on August 11, 1981, notice was filed that the record was now complete and that the defendant's opening brief was due to be filed within 25 days.

The question of whether inordinate delay in the process of an appeal constitutes a violation of due process is one of first impression in this court. Courts of other jurisdictions, however, have recognized that a defendant may be denied due process of law where there is an inordinate delay in the appeal process. *See, e.g., Rheuark v. Shaw,* 628 F.2d 297 (5th Cir.1980); *Way v. Crouse,* 421 F.2d 145 (10th Cir.1970); *People of Territory of Guam v. Olsen,* 462 F.Supp. 608 (D. Guam App.Div.1978).

A survey of the cases indicates that basically the courts have taken one of two approaches in deciding this issue. The first of these approaches focuses on the similarities of the defendant's interest in a speedy trial and his interest in a speedy appeal. Under this approach, the courts apply the four-factor balancing test developed for speedy trial violations.[20]

The second approach rejects the speedy trial analogy and focuses instead on the due process requirement of fairness. Under this approach, the one indispensable concern is prejudice to the defendant. *United States v. Alston,* 412 A.2d 351, 357 (D.C. App.1980). We believe the second approach to be the better view, and, in adopting this approach, find the *Alston* opinion persuasive.

19. This hearing was subsequently cancelled because the reporter had left the jurisdiction. The serious delay in preparation of the transcript here was caused by the reporter's breakdown in the face of an intolerable workload. To an extent, the judicial system must accept the blame for this delay. Nevertheless, we must also recognize that we depend upon fallible human beings and must acknowledge that no system or set of rules will ever produce perfection.

20. The four-factor balancing test developed by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), takes into consideration (1) the length of the delay, (2) the reason for delay, (3) whether the defendant demanded a more rapid trial, and (4) the prejudice resulting to the defendant as a result of the delay.

[The defendant's conviction at trial] can be said, in fairness, to rebut the presumption of innocence which underlies the right to bail, *see Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951), and implicitly, underlies the right to a speedy trial. Thus, in a fundamental sense—absent pretrial delay—the conviction and sentencing have satisfied the interests of the defendant, as well as the public, in a speedy trial, and the burden of persuasion on appeal has shifted from the state to the defendant. The variety of concerns of a defendant who has been accused but never brought to trial has been dispelled in the case of a defendant who had the opportunity to stand trial. Thus, judicial consideration of the appeal period does not require the kind of emphasis on delay as such that the Sixth Amendment imposes on the period between arrest and trial. It follows that, once again, there is one, predominant concern when a defendant faces appellate delay: prejudice to the ability to defend against the charge in the event of a second trial.

*Id.* at 358–59 (footnotes omitted).

■ Because we agree with the District of Columbia Court of Appeals that the focus in determining an issue of this nature should be upon the question of prejudice, we hold that in determining whether an inordinate delay in the appeal process constitutes a violation of due process, the predominant concern is prejudice to the defendant. This prejudice may result if the defendant has been unable to present an adequate appeal because of the delay or will be unable to adequately defend in the event the conviction is reversed on appeal and he is subject to a retrial. *See Alston, supra; State v. Lagerquist,* 254 S.C. 501, 506, 176 S.E.2d 141, 143 (1970). If the delay has been prejudicial to the defendant, then the court should decide whether the relationship between "(a) the nature and severity of the prejudice and (b) the government's alleged responsibility for it by delaying the appeal, warrants dismissal of the information or indictment...." *Alston, supra* at 359.

■ In this case, the defendant does not contend that he has been unable to adequately present his case on appeal. Nor does he argue that he will be unable to adequately prepare a defense in the event of a retrial. Instead, he alleges that he has suffered prejudice because he has had to spend 15 months in jail that he might not have had to spend if the trial transcripts had been filed in a timely manner and his conviction had been reversed. We do not believe that defendant's post conviction incarceration, absent a showing of resulting prejudice, violates due process. *Alston, supra* at 359. This is especially so since there is nothing in the record which shows that court practices are responsible for the delays or that the court administration refused to cooperate with the defendant in attempting to expedite the filing of the transcripts. *See Petition of Williams,* 378 Mass. 623, 393 N.E.2d 353 (Mass.1979); *State v. Crabtree,* 625 S.W.2d 670 (Mo.App.1981). *Compare Rheuark v. State, supra; People of Territory of Guam v. Olsen, supra.*

Therefore, we hold that the defendant was not denied due process of law because of the delay resulting from the untimely filing of the trial transcript.

■ We have also considered defendant's contention that the delay in the filing of the trial transcripts denied him the equal protection of the laws and find it to be without merit. It is to be noted that defendant does not claim that he has been subject to different treatment because he was indigent. *See Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Moreover, defendant has not been denied equal access to this court because we have fully considered the issues he raised on appeal. *State v. Lagerquist, supra.*

The judgment below is reversed and the case remanded for a new trial.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON, J., concur.

HAYS, Justice, concurring in part and dissenting in part:

I cannot agree with the majority's position that the trial court abused its discretion in excluding the testimony of an expert witness on eyewitness identification. With a view to preserving the integrity of the jury as finders of fact, I dissent in part.

It is the jury's task to determine the weight and credibility of a witness' testimony. What this court addresses is whether it is appropriate to have that determination put before the jury on the basis of expert witness testimony. Rule 704, Arizona Rules of Evidence, permits opinion testimony which embraces an ultimate issue if that testimony is otherwise admissible. However, rule 704 does *not* resolve all worry about invading the province of the jury. Testimony which is of such common knowledge that persons of ordinary education and background could reach as intelligent a conclusion as the expert shall be excluded. *State v. Williams,* 132 Ariz. 153, 644 P.2d 889, 896 (1982).

Courts have consistently held that expert testimony relating to eyewitness identification constitutes an invasion of the jury's province.[1] While I recognize the problems in eyewitness testimony, I am unable to distinguish the case at bench from the wealth of cases where identification is in issue.

Identification of a criminal defendant is always crucial, notwithstanding the number of issues in a case. The fact that identification was defendant Chapple's sole defense should not compel us to carve out an exception to our rule against such testimony.

Our rules of evidence provide that a witness shall be impeached through cross-examination. "It is the responsibility of counsel during cross-examination to inquire into the witness' opportunity for observation, his capacity for observation, his attention and interest and his distraction or division of attention." *United States v. Amaral,* 488 F.2d 1148, 1153 (9th Cir.1973). A defense attorney can properly expose through cross-examination of the witness the time interval which passed between the occurrence of the event and the line-up and, through probing questions, the effects of stress and drugs on the witness' perception. Allowing an expert to testify on the factors affecting the reliability of identification by an eyewitness is merely a guise for impeaching that witness. We cannot permit an expert to disparage the memory of a witness in order to impeach him. The ability of a person to make accurate observations is to be considered by the jury when assessing that witness' credibility.

I also disagree with the majority's conclusion that the average juror does not know that immediate identification is much more trustworthy than long-delayed identification. The average juror may not know the technical terms for this phenomenon, but that is not relevant to his ability to assess a witness' credibility.

My concern here goes beyond the borders of this case. Once we have opened the door to this sort of impeaching testimony, what is to prevent experts from attacking any real or supposed deficiency in every other mental faculty? The peculiar risk of expert testimony with its scientific aura of trustworthiness and the possibility of undue prejudice should be respected. I have great reluctance to permit academia to take over the fact-finding function of the jury. Although clothed in other guise, that will be the practical effect. With little to distinguish this case from the general rule against admitting expert testimony on eyewitness identification, we are left with no guidelines to decide the deluge of similar issues which are sure to result.

I dissent in part.

---

1. *See* n. 10 of majority opinion.