About midnight one summer evening, Pam and Dan Golliher's telephone rang.[1] Before they could answer it, their answering machine recorded a message from their neighbor, Michelle Pettit. Within minutes after the Gollihers received the message, Michelle arrived at their front door with her baby. She appeared upset, was crying, and had a bleeding cut above her swollen eye. She told the Gollihers that her husband, appellant Charles Pettit, had hit her while she was holding their baby. Although Michelle and Pam asked Dan not to report the incident, he decided to call the police based on Michelle's appearance and her emotional state. Shortly thereafter, when Charles came looking for Michelle, Dan met him on the sidewalk, saw that he was distraught, and told him to return home because the police were on their way.
Officers Barnes and Alejandro and Lieutenant Mays, of the Loveland Police Department, arrived at the Gollihers' home in response to Dan's call. Pam met them at the door and refused to let them in, stating that Michelle was no longer there. Dan told Pam to let the officers enter. When they did, Pam led them to the bathroom where Michelle was hiding. According to Barnes, he and Alejandro entered the bathroom, where he briefly viewed Michelle and heard her crying and sounding very distraught. After Mays entered the bathroom, Barnes left the area. Dan informed him of Michelle's recorded message. At the instruction of Mays, Barnes listened to it, and upon retrieving recording equipment, he made a tape of the message.
Alejandro claimed that he and Mays first entered the bathroom. He saw Michelle sitting on the toilet, holding her baby. She was hysterically crying and had injuries to her eye. He concluded from her appearance that she had received a "pretty hard" blow to the face. Based on his experience, he thought the injury was the result of a punch or kick. When he asked her what had happened, Michelle told the officer that she had fallen and did not want to get Charles in trouble. Alejandro also said that he did not see anything about Michelle's injuries that would have been inconsistent with an accidental hit or strike.
According to Mays, Michelle said that she and Charles had been arguing about finances and that he had struck her with his fist. He relayed to Alejandro that Michelle had told him that Charles had punched her in the face with his fist.
Although Michelle did not want medical attention, Alejandro believed the injury warranted it and told her he was calling for help. He returned with a camera to photograph Michelle's injuries and found Mays and Michelle in the Gollihers' living room. Although Michelle attempted to hide from the camera, Alejandro took some photographs. At that point, Michelle acted as if she did not want any more involvement with the police and said that she and her husband would handle the incident themselves. (Two days later, Michelle told Pam the incident was an accident involving the telephone.)
Michelle called her father-in-law to ascertain her rights concerning the police investigation. About this time, Charles entered the house. Based upon Mays's information and what Alejandro had seen, Alejandro placed Charles under arrest for domestic violence. Meanwhile, Barnes, who had been completing paperwork in his cruiser, saw Charles walk into the Gollihers' house and observed him being taken out in handcuffs. He helped Alejandro place Charles in the cruiser. The officers did not check Charles's hand for injury.
While Charles was being placed in the cruiser, Mays heard Charles threaten to sue the police and heard him tell Michelle not to tell the police anything and that his father would get him out of the situation. Alejandro said Charles kept saying, "This is wrong, this is not right, I'm going to get you guys, I'm going to sue you. My dad's a lieutenant with — a lieutenant with some police department; I believe it was University of Cincinnati." He also recalled hearing Charles say that his arrest was a false arrest, that he was a martial-arts expert, and that if he had wanted to get Michelle, he would have killed her. Charles also said that Michelle had injured herself by falling on a shelf. He made no comment about Michelle's injuries being caused by a telephone.
When asked on cross-examination whether Charles yelled, "This is not right, this is not how it happened," Alejandro could only recall Charles saying, "Don't tell them anything, they don't know what happened. The police are wrong."
None of the officers made a written report of Charles's comments upon being arrested. None of the officers remembered providing a statement to the prosecutor's office about the incident or what was said by Charles during his arrest.
Later that evening Dan went to the Pettits' house to set out the cans for trash collection. He found the telephone on the patio. The phone receiver had some blood droplets on the keypad, as did the phone holder in the house. Dan cleaned the blood from the receiver.
Both Michelle and Charles testified at trial that they had been arguing over finances during the evening. Charles finally went to bed. Michelle went upstairs to tell him she was leaving. She then called the Gollihers and left the message. Charles came downstairs and called a friend to see about playing pool. Michelle returned because she had forgotten a diaper bag. When their backs were to each other, she made a comment. Both turned at the same time, and the telephone receiver accidentally hit Michelle in the eye. The impact knocked the receiver from Charles's hand. Charles put a wet cloth on her eye. Michelle was still angry, so she left, taking the receiver with her. She left it on the patio on her way to the Gollihers. When she arrived at the Gollihers, she may have told Pam, "I was holding the baby and I think he hit me." She said that she was not crying and was not hysterical. She also told Dan there was no reason to call 911 because it was an accident.
When the police arrived, she told them she would not give them Charles's name because they would arrest him, to which Mays responded, "You're damned right." She began crying and yelling, and the police threatened to arrest her and put her child in foster care. Mays did not ask her what had occurred, and she never told Mays that Charles had punched or struck her. While she was on the phone with her father-in-law, Charles peeked around the corner. She identified him as her husband and the police arrested him. Charles told her nothing from the time she saw him until he left handcuffed.
At the next day's bond hearing, Michelle told the court that Charles had never been violent and that the incident resulting in his arrest had been an accident. She testified at trial that as a result of a car accident her right eye was extremely sensitive and would swell and turn black at the slightest irritation, including tears. This was corroborated by her friend's testimony. Michelle's nine-year-old daughter and a friend living in the Pettits' home testified that they had never seen Charles hit Michelle.
Charles said he told the officers that there was a mistake, that there was no reason for his arrest and that the incident was an accident. He denied saying his father would get him out of the situation. He testified he did not punch his wife in the eye or otherwise intentionally strike her.
 I. CONVICTION AND APPEAL
The trial court convicted Charles of domestic violence in violation of R.C. 2919.25(A) following a jury's guilty verdict. He appeals, raising five assignments of error.[2] The first assignment of error claims that the evidence was legally insufficient to support the jury's verdict. In the second, he contends the trial court erred to his prejudice by refusing to submit his requested instruction to the jury. The third challenges the denial of his motions for a mistrial. The fourth assignment is that the trial court erred by quashing a subpoena issued to an assistant prosecutor. And the last questions the exclusion of the state's supplemental discovery response as evidence.
 A. Only Inherently Suspicious Out-of-Court Statements Recanted at Trial Require Corroboration
In support of his first assignment, Charles argues that, based on our holding in State v. Attaway,[3] independent evidence is necessary to prove the offense of domestic violence. This argument seeks to broaden our conclusion in Attaway. We held inAttaway that the credibility of a statement made to the arresting officer by the victim, which was uncorroborated and completely contradicted by the victim's testimony at trial, was so inherently suspect that it was legally insufficient to establish Attaway's guilt beyond a reasonable doubt. Obviously, our holding was limited to the facts of that case. The victim in Attaway was intoxicated, a self-described drunk who was full of anger and recrimination against Attaway when she told the arresting officer that Attaway had punched, kicked, stomped, and choked her. Because her statement was so inherently suspect, we concluded that it needed corroborative evidence to fall within the guarantee of trustworthiness afforded an excited utterance.
Unlike the statement in Attaway, Michelle made the statement that Charles had hit her to the Gollihers minutes after the incident. She repeated the statement to the officers soon afterwards, while still crying and appearing distraught. Further, the surrounding circumstances did not make the statement inherently suspect. Michelle was neither intoxicated nor a self-described alcoholic. She did not claim in her recantation at trial that the statement was the result of recrimination. Instead, she admitted making the statement to the Gollihers, but denied making the statement to the officers. Further, the recantation did not deny that Charles was the perpetrator, only that the incident was an accident. Under the facts of this case, we cannot conclude that Michelle's statement was so inherently suspect that it was unbelievable as a matter of law.
To reverse a conviction based on insufficient evidence, we must determine that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4] To sustain a conviction under R.C. 2919.25(A), the state must prove that the defendant knowingly caused or attempted to cause physical harm to a family member. The state presented evidence through Michelle's statement to the Gollihers and to the police officers that Charles struck her. It presented evidence that Michelle and Charles were married and lived together. It also presented evidence that Michelle suffered physical harm when Charles struck her. We overrule Charles's first assignment of error.
 B. Charles's Requested Jury Instruction Was Legally Incorrect
In his second assignment of error, Charles claims the trial court erred by not providing the jury an instruction based onState v. Attaway, supra. First, as we have discussed in our resolution of Charles's first assignment of error, the proposition of law asserted by Charles is unduly overbroad.Attaway does not stand for the blanket proposition that any out-of-court statement by a victim of domestic violence concerning the identity of the perpetrator, when contradicted by the victim at trial and not otherwise corroborated, is legally insufficient to support a conviction.
Further, even had Charles's instruction been legally correct, Charles failed to object to the denial of the instruction. Under Crim.R. 30, with respect to rulings on jury instructions, a failure to object to an instruction at trial constitutes a waiver of all but plain error. Plain error requires that error be committed, that but for the error the result of the trial would have been otherwise, and that failure to consider the error would result in a clear miscarriage of justice.[5] Under the facts of this case, we conclude that there was no plain error. Charles's second assignment of error is overruled.
 C. Charles Was Not Entitled to a Mistrial
In his third assignment, Charles argues that he was entitled to a mistrial because the prosecutor failed to provide discovery in violation of Crim.R. 12 and 16. The record demonstrates that Charles filed a pretrial request, pursuant to Crim.R. 12(D)(2), for notice of the evidence the prosecution intended to use at trial. That rule states that a defendant "may request notice of the prosecuting attorney's intention to use evidence in chief at trial, which evidence the defendant is entitled to discover under Crim.R. 16." Crim.R. 16(B)(1) allows a defendant to inspect, copy, or photograph, in pertinent part, written summaries of any oral statements made by a defendant to an officer or prosecuting attorney.
The written summary provided to Charles by the state included the following:
 The defendant told the officers that the victim had not been hit, but had run into an object. The defendant also, as he was being taken out of the house by the officers, made comments to the victim, telling her not to go forward with this, and it did not happen the way that the officers thought it did.
Assistant Prosecuting Attorney Tricia Landthorn signed the response.
At issue are Charles's alleged statements about which Alejandro and Mays testified. Alejandro testified that he read Charles his Miranda rights as he handcuffed him. Alejandro stated that during the reading of those rights Charles said, [T]his is wrong, this is not right, I'm going to get you guys, I'm going to sue you. My dad's a lieutenant * * *." Counsel made no objection at this point to Alejandro's testimony. Alejandro recalled hearing Charles say that his father was a lieutenant at the University of Cincinnati, that the officers were wrong, and that his arrest was a false arrest. Alejandro also testified that Charles told him Michelle received her injuries by falling on a shelf. No objection was made to this testimony.
On cross-examination, Alejandro admitted that he did not write down Charles's statements and that he was testifying from memory. He also admitted that he did not remember exactly what Charles had said, when asked if Charles had told Michelle not to go forward and that it had not happened the way the officers thought it did. Charles's counsel showed Alejandro the state's "Supplemental Response to Defendant's Demand for Discovery," which contained the written summary of Charles's statements. The trial court sustained the state's objection to having Alejandro read the statements into evidence. Counsel then used the statements to impeach Alejandro. He asked Alejandro whether he told the prosecutor that Charles had said Michelle had run into an object. Alejandro testified he could not recall whether he had spoken with anyone from the prosecutor's office prior to one day before the trial. He did not believe that he told anyone that Charles had said Michelle had run into a shelf. In response to further cross-examination about Charles's plea that Michelle not go forward with the arrest because the incident did not happen the way the police thought, Alejandro testified he recalled Charles saying, "Don't tell them anything, they don't know what happened."
Mays testified the next day during direct examination that Charles had said to Michelle, "[D]on't tell them anything, my father will get me out of this." At that point Charles made his first objection, which was limited specifically to Mays's response. He also requested a mistrial, arguing that Mays had improperly based his testimony on Alejandro's previous testimony, and that the testimony concerned a statement that had not been given to Charles during discovery. On cross-examination, Mays stated he had not spoken with Assistant Prosecuting Attorney Landthorn about any statements Charles may have made. Mays also stated he had not written down Charles's statements. Mays did not recall seeing anything in the case file containing the statement about which he was specifically testifying. Mays did not remember Charles making any other statement.
Charles testified that he told the officers that Michelle's injuries were the result of an accident. He also testified he did not say that his father would get him out of the situation. Michelle denied Charles said anything to her from the time he was handcuffed until the police placed him in the cruiser.
Charles claims that the statements were withheld by the state for tactical advantage and that since he sought such information in order to file a motion to suppress, the failure to provide the statements violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. He asserts that the trial court erred by denying his motions for a mistrial.
Whether to deny a motion for a mistrial rests within the sound discretion of the trial court.[6] "Something is discretionary because it is based on an assessment of conflicting procedural, factual, or equitable considerations which vary from case to case and which can be better determined or resolved by the trial judge, who has a more immediate grasp of all the facts of the case, an opportunity to see the parties, lawyers, and witnesses, and who can better assess the impact of what occurs before him."[7]
 1. The State Violated Crim.R. 16
At issue is whether the state failed to comply with Crim.R. 16(B)(1)(a)(ii), and, if so, the appropriate sanction for the violation. Charles argues that the trial court erred by allowing into evidence the testimony of Alejandro and Mays when it was based on statements that were not provided in compliance with Crim.R. 16. "The purpose of discovery rules is to prevent surprise and the secreting of evidence favorable to one party. The overall purpose is to produce a fair trial."[8] Crim.R. 16(B)(1)(a)(ii) requires a written summary of any oral statement made by a defendant. An oral statement heard by a police officer is discoverable under Crim.R. 16.[9] Even if the office of the prosecuting attorney is not aware of such statements, since " '[t]he police are a part of the state and its prosecutional machinery,' State v. Tomblin (1981), 3 Ohio App.3d 17,18, 3 OBR 18, 20, 443 N.E.2d 529, 531, such knowledge on the part of a law enforcement officer must be imputed to the state."[10] Thus, because the oral statements heard by Alejandro and Mays were discoverable under Crim.R. 16, the state failed to comply with Crim.R. 16(B) when it failed to disclose the statements.
Crim.R. 16(E)(3) provides that
 If at anytime during the course of the proceedings it is brought to the attention of the trial court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.
Reversible error exists only where the trial court's decision on a sanction for nondisclosure of discoverable material constitutes an abuse of discretion.[11] A trial court abuses its discretion in admitting undisclosed discoverable material when the record demonstrates: "(1) the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that the foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by the admission of the statement."[12]
Though this case does not rise to the level of reversal, it is one more case where the prosecution's inattention to discovery might, upon a different record, require reversal. It is surely better for the state to spend a bit more effort complying with discovery rather than in defending an appeal and perhaps prosecuting a new trial.[13]
 2. The Record Fails to Demonstrate That the Discovery Violation Was Willful
The record fails to demonstrate that the admission of the officers' testimony constituted reversible error. First, the officers testified that they did not provide the prosecutor's office with the verbal statements allegedly made by Charles. "While the knowledge of [the officers] of the statements made by appellant is imputable to the prosecution for purposes of determining whether the rule was violated, such imputed knowledge is not sufficient to constitute a willful violation thereof. Instead, the acts of the prosecution itself must be evaluated."[14] In this situation the officers could not remember whether they had spoken to the prosecutor's office prior to trial. They testified that Charles's statements had not been put in writing. Mays testified that the case file contained nothing to reflect the verbal statement he recalled. The state provided the names of Alejandro and Mays as witnesses for trial, along with a timely summary, erroneously assuming that the broadly and generically worded summary was sufficient. It was not. We do not believe, however, under these facts, that the erroneous assumption was tantamount to a willful violation, though it was surely negligent, and in a different case might serve as grounds for reversal. On this record, though, we are unwilling to overrule the discretion of the trial judge.
 3. Charles Failed to Demonstrate How Foreknowledge of Testimony Would Benefit His Case
As to the second prong of the Parsons test, Charles claims that foreknowledge of the statements would have benefited his case, because he would have filed a motion to suppress the officers' testimony concerning his statements. This bald assertion fails to meet this test.[15] Charles did not explain how foreknowledge of the officers' somewhat innocuous statements would have benefited him in the preparation of his defense.[16]
 4. Charles Failed to Demonstrate Prejudice
We next consider whether Charles demonstrated how he was prejudiced by the statements. Prejudice warranting a reversal requires the defendant to demonstrate that "the state's failure to comply with Crim.R. 16(B)(1)(a)(ii) prejudiced his ability to reveal a weakness in the state's case or his ability to present a credible defense more effectively."[17]
We first note that the statements made to Alejandro and Mays were not the state's sole evidence that Charles knowingly caused physical harm to Michelle. There was other testimony indicating that Michelle herself had said that Charles had struck her. There was also evidence of injuries consistent with a hit or punch.
Further, Charles's threat to sue the officers for arresting him and his reference to his father's employment as a police officer, while not presented in the summary, did not detract from Charles's defense that he did not hit Michelle, nor did it add support to any element of the state's case. Further, the record reflects that Charles made no objection to the testimony of Alejandro regarding the statement.
Charles did move for a mistrial following Mays's testimony that Charles told Michelle not to tell the officers anything, and that his father would get him out of the situation. We believe that this statement was not "clearly inculpatory," as Charles argues. It in no way contradicted Charles's testimony that he did not hit Michelle, nor did it impugn Charles's denial of the crime. It was at best a neutral statement, not an admission of guilt.
Charles's defense was that he accidentally hit Michelle with a telephone receiver. According to Alejandro, Charles said Michelle "fell into a shelf." The summary stated that Michelle "ran into an object." Charles made no objection to Alejandro's testimony. Instead he sought to cross-examine Alejandro with the summary in an attempt to impeach his credibility. "Discovery violations are subject to exclusion of evidence that should have been provided in discovery but was not. The relief is granted on the motion of the party prejudiced by the violation. The motion may be made by way of objection when the evidence is offered * * *. If a timely objection is not then made, any objection to the discovery violation is waived."[18]
Thus, unless the admission of Alejandro's testimony constituted plain error Charles's failure to object waived any error.[19] Plain error under Crim.R. 52(B) exists where, but for the error, the outcome of the trial clearly would have been otherwise.[20] In this case, we cannot say that the admission of Alejandro's testimony constituted plain error. Charles's third assignment of error is overruled.
 D. The Trial Court Did Not Abuse Its Discretion in Granting the State's Motion to Quash a Subpoena Issued to an Assistant Prosecutor
In his fourth assignment of error, Charles claims that the trial court erred in granting the state's motion to quash his subpoena of Assistant Prosecutor Landthorn. Charles sought to call Landthorn as a witness to question her about the discrepancies between the officers' testimony and the summary provided by her in response to his discovery request. A prosecutor's testimony may be admitted at trial in "extraordinary circumstances and for compelling reasons, usually where the evidence is not otherwise available."[21] The reason Charles sought to put the assistant prosecutor on the stand was for purposes of duplicative impeachment. He had the summary and his and Michelle's testimony to impugn the credibility of Alejandro. Further, we do not believe that the reference to "running into an object" was so inconsistent with Alejandro's testimony that he recalled Charles saying Michelle fell into a shelf so as to require the testimony of the assistant prosecutor.
 E. The Trial Court Did Not Abuse Its Discretion in Excluding the State's Discovery Response
In his last assignment, Charles claims the trial court erred by not admitting as an exhibit the statement summary contained in the state's discovery response. Assuming for the sake of argument that the summary was admissible, we conclude that its exclusion was not an abuse of discretion. The information Charles deemed relevant was effectively placed before the jury by Charles's counsel during cross-examination of the officers and direct examination of Charles. The admission of the document itself would merely have been cumulative.
Accordingly, we affirm the judgment of the trial court.
Judgment affirmed.
DOAN, P.J., and GORMAN, J., concur.
Please Note:
The court recorded its own entry on the date of the release of this Decision.
[1] We use the first names of the Gollihers and the Pettits to avoid confusion that could result because each couple shares a marital surname.
[2] We have removed this case from the accelerated calendar.
[3] (1996), 111 Ohio App.3d 488, 676 N.E.2d 600.
[4] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[5] State v. Braxton (1995), 102 Ohio App.3d 28, 44,656 N.E.2d 970, 981.
[6] Tracy v. Merrell Dow Pharmaceuticals, Inc (1991), 58 Ohio St.3d 147,152, 569 N.E.2d 875, 880.
[7] State v. Echols (June 26, 1998), Hamilton App. No. C-970272, unreported, quoting State v. Chapple (1983), 135 Ariz. 281,297, 660 P.2d 1208, 1224, fn. 18.
[8] Lakewood v. Papadelis (1987), 32 Ohio St.3d 1, 3,511 N.E.2d 1138, 1140.
[9] State v. Bidinost (1994), 71 Ohio St.3d 449, 454-456,644 N.E.2d 318, 324.
[10] State v. Wiles (1990), 59 Ohio St.3d 71, 78, 571 N.E.2d 97,110.
[11] State v. Wiles at 78, 571 N.E.2d at 110.
[12] State v. Parsons (1983), 6 Ohio St.3d 442, 453 N.E.2d 689, syllabus; State v. Bidinost at 457, 644 N.E.2d at 325.
[13] See State v. Penland (Dec. 3, 1998), Hamilton App. No. C-970387, unreported.
[14] State v. Wiles at 79, 571 N.E.2d at 110.
[15] Accord State v. Lang (1995), 102 Ohio App.3d 243, 253,656 N.E.2d 1358, 1363; State v. White (Dec. 7, 1995), Cuyahoga App. No. 68645, unreported.
[16] State v. Bidinost at 457, 644 N.E.2d at 325.
[17] State v. Spirko (1991), 59 Ohio St.3d 1, 9, 570 N.E.2d 229,242, certiorari denied (1991), 502 U.S. 913, 112 S.Ct. 312.
[18] State v. Davis (Sept. 20, 1996), Miami App. No. 95 CA 59, unreported.
[19] See State v. Underwood (1983), 3 Ohio St.3d 12,444 N.E.2d 1332.
[20] State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804.
[21] State v. Coleman (1989), 45 Ohio St.3d 298, 302,544 N.E.2d 622, 627-628, quoting United States v. Johnson (C.A.7, 1982),690 F.2d 638, 644; State v. Lagore (Mar. 2, 1992), Ross App. No. 1719, unreported.